THE WISCONSIN MARINE & FIRE INSURANCE COMPANY BANK Appellant, vs. MANN and another, imp., Respondents.

*September 22 — October 11, 1898.*

*New trial after reversal of judgment: Amendment of pleading:* Res adjudicata: *Mistakes of counsel: Reformation of contract: Judgment.*

1. The supreme court, on reversing a judgment, directed judgment to be entered for the plaintiff, unless the trial court should, in its discretion, grant leave to certain defendants to amend their answer so as to raise and present for trial the issue of a reformation of the contract upon which the action was based. *Held,* that the mandate in effect granted a new trial upon the condition mentioned.

2. On appeal from a judgment rendered after the determination of the issues raised by the amended answer in such a case, the only question to be determined with reference to the amendment is whether the discretion of the trial court was properly exercised, its power to allow the amendment being *res adjudicata.*

3. Although a judgment cannot be set aside and a new trial granted merely on the ground of a mistake of counsel on a question of law, yet, after reversal of a judgment on appeal, if the mandate is sufficiently broad to permit it, the trial court may allow the pleadings to be amended so as to meet the objections to the former judgment, and to that end may allow a defense improperly pleaded to be perfected or a new defense by way of counterclaim or otherwise to be pleaded, although the effect is to relieve a party from the effect of such a mistake.

4. In an action on a contract of guaranty there was a counterclaim for reformation of the contract. An oral agreement had been made between the plaintiff bank, acting through its cashier, and representatives of a corporation, in respect to the stockholders in such corporation guaranteeing its indebtedness to the bank, but the testimony of the actors in the matter differed as to the exact terms of such agreement. It appeared, however, among other things, that there had never been any intention to change that agreement, and that the cashier, pursuant to the understanding then had, drafted a form for a contract of guaranty, which was submitted to and signed by the guarantors; that by the clear and unambiguous terms of this contract each of the guarantors became liable only for such proportion of the indebtedness as the amount of his stock in the corporation bore to the whole amount of its paid-up capital; that the cashier afterwards had a second writing prepared by at-

torneys, to be substituted for the first because that was only a rough draft; that the second writing contained a joint and several unlimited guaranty; that in a letter submitting the second writing the cashier acknowledged receipt of the first as a binding contract until exchanged for the second, and in effect asserted that there was no difference between the two except as to form; that the guarantors objected to the second writing because it did not properly limit their liability, and thereupon a clause was added to it, stating that it was understood that they were to pay in the proportion which the stock of each bore to the whole amount of capital paid in, and the writing as thus modified was signed and substituted for the first draft; and that the clause so added was afterwards held repugnant to the principal clause which preceded it, and of no effect as between the bank and the guarantors. It also appeared that the guaranty had not been signed by all the stockholders, and that among the signers were two subscribers for stock whose subscriptions had been accepted, but who had not paid therefor and had not received certificates. *Held*, that these facts showed conclusively that the oral agreement had been correctly expressed in the first writing, and warranted a finding of the trial court that there had been a mutual mistake of the parties, in that the contract as finally written did not express their agreement.

5. Where there is a mutual mistake, either of fact in the making of a contract, or of law or fact in the reduction of the contract to writing, the person injured thereby may have it reformed in equity in accordance with the truth, in the absence of facts or circumstances constituting a waiver of the remedy or an estoppel to the assertion of it; and it is immaterial in such case whether the writing was drafted by the parties or by a third person. *Neff v. Rains*, 33 Wis. 689, criticised.

6. A failure of the trial court, before entering judgment, to actually reform a contract which it holds does not correctly express the intention of the parties, or to determine the exact change of language requisite to be made, is a mere irregularity and therefore not ground for reversal, where such failure can work no injury to appellant.

APPEAL from a judgment of the superior court of Milwaukee county: GEO. E. SUTHERLAND, Judge. *Affirmed.*

An action was brought on a written agreement which is in the following words:

"Whereas, the Wilkin Manufacturing Company, of Mil-

waukee, is indebted to the *Wisconsin Marine & Fire Insurance Company Bank, of Milwaukee, Wisconsin,* in the sum of about $9,000 (nine thousand dollars);

"And whereas, the said company may hereafter become indebted to said bank for additional amounts;

"Now, therefore, in consideration of the premises, and of one dollar to each of us in hand paid, the receipt whereof is hereby acknowledged, we and each of us do hereby agree upon demand to pay, or cause to be paid, to said *Wisconsin Marine & Fire Insurance Company Bank,* all loans, drafts, overdrafts, indorsements, accounts, checks, notes, interest, demands, and liabilities, of every kind and description, now owing, or which may hereafter become due or owing, by said Wilkin Manufacturing Company to said *Wisconsin Marine & Fire Insurance Company Bank.*

"It is understood that we each waive notice of demand and notice and protest of every kind, and agree that said bank may without notice grant extensions of time to said company, and may from time to time renew any obligations of said company. This is a continuing guaranty.

"It is understood that we are to pay any sums which may accrue hereunder in the proportion which the amount of stock now held by each of us in said company bears in the whole amount of capital paid in by said company."

The instrument was signed by all of the defendants, each of whom was a holder of paid-up stock except Wilkin and Morris. The principal issue on the trial was as to whether the contract was a joint and several obligation, or the liability of each signer was limited to such proportion of the indebtedness of the debtor corporation to the plaintiff as such signer's stock in such corporation bore to the whole amount of its paid-up capital stock. The trial court decided in favor of the limited liability. Plaintiff appealed from the judgment, which resulted in its reversal, the court holding that the true construction of the contract was that the signers

incurred a joint and several liability. The cause was remanded with instructions to enter judgment in favor of the plaintiff in accordance with the opinion of the court, unless the court below, in its discretion, should determine to grant to the defendants *Mann* and *Munkwitz* leave to amend their answers so as to raise and present for trial the issue of a reformation of the contract on which the action is based. Upon the case again reaching the latter court, defendants *Mann* and *Munkwitz* applied for leave to amend their answers within the scope of the power granted as aforesaid to allow it. The application was granted. Issue was joined on the amended answer and a trial had which resulted in findings of fact and conclusions of law in substance as follows:

(1) The first agreement for a guaranty between the plaintiff bank and the representatives of the Wilkin Manufacturing Company was that a contract of guaranty should be given to the bank, signed by stockholders of the company, making each signer liable to the bank for such proportion of any indebtedness of the company to the bank, then existing or thereafter incurred, as the amount of stock held by him bore to the whole paid-up stock of the corporation, and that agreement was reduced to writing by the cashier of the bank as follows:

"Whereas, the Wilkin Manufacturing Company, of Milwaukee, is indebted to the *Wisconsin Marine & Fire Insurance Company Bank* in the sum of four thousand dollars for money borrowed for the purpose of said company, and

"Whereas, also it will be necessary for said company to borrow from said bank other sums of money in addition to the amount set forth.

"Now, therefore, in consideration of the premises and of $1.00 to us in hand paid, we and each of us do severally promise and agree to and with said bank to pay said bank as the said sum may become due, such proportion of said indebtedness now owing or which may hereafter be owing

by said company to said bank, whether the same be on notes, indorsements by said company, or overdrafts from said bank, or any other form of indebtedness to said bank, as the amount of stock owned by us in the said company bears to the whole amount of capital paid up of said company."

The agreement so drawn was dated December 22, 1887, was signed by the defendants, and delivered to the plaintiff.

(2) At the date aforesaid, defendants Fink, *Mann,* Diederichs, and Vogel, each owned forty-four shares of paid-up stock, defendant *Munkwitz* twenty shares, and defendant Trumpff twenty-four shares, and defendant Wilkin was a subscriber for 200 shares.

(3) After the occurrences before stated, plaintiff submitted to defendants the draft of another contract for signatures, to which they objected because it failed to limit the liability of each signer as in the original agreement.

(4) Therefore it was agreed that the new agreement should be modified so as to conform to the original agreement; that plaintiff's cashier should see that such alteration was properly made, and, intending to do so, he caused to be inserted in the new draft the following: "It is understood that we are to pay any sums which may accrue hereunder in the proportion which the amounts of stock now held by each of us in said company bears in the whole amount of capital paid in by said company."

(5) Such alteration was made intending to limit the liability of each signer thereof as in the original contract of guaranty, and the failure to carry out such intention is due primarily to the mistake of plaintiff's cashier, but all parties to the agreement participated in such mistake.

(6) All loans and advances made by plaintiff to the manufacturing company were made under the belief that the guaranty bound the signers only in the proportion which their several holdings of stock bore to the total paid-up stock of the corporation.

The Wisconsin Marine & Fire Ins. Co. Bank vs. Mann and another.

(7) Defendants *Mann* and *Munkwitz* have paid to plaintiff the full amount for which they are liable under the guaranty.

(8) January 9, 1898, the stock of the corporation was held as before stated.

Upon such findings of fact the court concluded that defendants *Mann* and *Munkwitz* were entitled to have the contract of guaranty reformed so as to limit the liability of each to such proportion of the indebtedness incurred by the corporation to plaintiff as the amount of stock held by him at the date of the contract bore to the whole paid-up capital of the corporation, and to a judgment accordingly, and dismissing the complaint as to them, with costs.

Judgment was so entered, from which this appeal was taken, exceptions having been seasonably filed to raise the questions discussed in the opinion.

For the appellant there was a brief by *Miller, Noyes, Miller & Wahl*, attorneys, and *Fish & Cary*, of counsel, a separate brief by *John T. Fish*, of counsel, and the cause was argued orally by *Geo. H. Noyes* and *John T. Fish*. They contended, *inter alia*, that the guaranty cannot be reformed because it was written and signed just as both of the parties intended and agreed it should be. *Sibert v. McAvoy*, 15 Ill. 106, 109; *Fowler v. Black*, 136 id. 363, 378; *Oswald v. Sproehnle*, 16 Ill. App. 368. The mistake, if any was made, occurred through the negligence of the defendants. They are now precluded from saying that there was a mistake. *Mitchell v. Holman*, 30 Oreg. 280; *Metropolitan Loan Asso. v. Esche*, 75 Cal. 513; *Marshall v. Westrope*, 98 Iowa, 324. The instrument cannot be reformed, as the mistake if any was not one of fact, but one of law pure and simple. *Neff v. Rains*, 33 Wis. 689; 1 Story, Eq. Jur. (Redf. ed.), §§ 138, 138*b*, 138*d*. The defendants having elected to try the case at law, are now precluded from again trying it in equity. *Garvin v. Squires*, 9 Ark. 533, 50 Am. Dec. 224, 225; *Sanger*

The Wisconsin Marine & Fire Ins. Co. Bank vs. Mann and another.

*v. Wood,* 3 Johns. Ch. 416; *McQueen's Appeal,* 104 Pa. St. 595, 49 Am. Rep. 592; *Bolton Mines Co. v. Stokes,* 82 Md. 50, 31 L. R. A. 789, 791; *Washburn v. Great Western Ins. Co.* 114 Mass. 175; *Steinbach v. Relief F. Ins. Co.* 77 N. Y. 498; *Thomas v. Joslin,* 36 Minn. 1; *Spurr v. Home Ins. Co.* 40 id. 424; *Ean v. C., M. & St. P. R. Co.* 101 Wis. ——; *Whitney v. Traynor,* 76 id. 628, 630. The findings of the court are defective and irregular in not providing how the instrument as reformed shall read. Kerr, Fraud & M. (2d ed.), 497; *Fowler v. Fowler,* 4 De Gex & J. 250–265; *Fish v. N. Y. W. P. P. Co.* 29 N. J. Eq. 10; *McMillan v. N. Y. W. P. P. Co.* id. 610. The judgment was unauthorized. There was but one contract made between the plaintiff and the defendants. Suit was brought upon this contract. To sustain this judgment it must be held that in an action upon one instrument the court can split it up and adjudge that as to some of the signers of it the instrument had one legal effect and was one instrument, and as to the other defendants it had an entirely different effect and was an entirely different instrument. *Nichols v. Crittenden,* 74 Wis. 459.

For the respondents there was a brief by *Stark & Hansen,* attorneys for *Mann,* and *Winkler, Flanders, Smith, Bottum & Vilas,* attorneys for *Munkwitz,* and oral argument by *F. C. Winkler* and *Joshua Stark.* They argued, among other things, that the parties at the time of signing the contract knew the words it contained; the mistake was in attaching a meaning to one clause of it which it has been found it does not bear. The parties in inserting this clause gave it a different interpretation and intended for it a different effect from that which the law puts upon it. The judgment reforms it so as to give it the effect the parties intended. This is within the reforming jurisdiction of a court of equity. *Hagenah v. Geffert,* 73 Wis. 636–641; *Kyle v. Fehley,* 81 id. 67; *Lardner v. Williams,* 98 id. 514; Pomeroy, Eq. Jur.

The Wisconsin Marine & Fire Ins. Co. Bank vs. Mann and another.

§ 844; *Dinwiddie v. Self*, 145 Ill. 296–306; *Minot v. Tilton*, 64 N. H. 371–374; *Griswold v. Hazard*, 141 U. S. 266–284, and cases cited by the court.

MARSHALL, J.   In the decision on the first appeal in this case, *Wis. M. & F. Ins. Co. Bank v. Wilkin*, reported in 95 Wis. 111, well-established principles of law there clearly stated led to a construction of the contract of guaranty as then contended for by the present appellant, without determining precisely the intention of the parties in making it. Applying the principle that contracts are to be construed so as to bring them as near the actual meaning of the parties as the words they saw fit to employ, when properly construed, and rules of law will permit, we held the principal clause of the agreement to contain a joint and several, unlimited obligation, and the added clause, in regard to liability in proportion to the holdings of stock owned by the several signers, as merely prescribing a rule of contribution between such owners.   No other result could have been reached.   The added clause was plainly repugnant to the principal clause which preceded it; so, under the rule that a stipulation restricting what is previously distinctly stated in a contract, and which forms the principal inducement to it, when the whole instrument is so prepared that the latter clause cannot be reasonably construed as incorporated in the first, must be rejected, we were compelled to treat the contract, as between plaintiff and defendants, the same as if the limitation clause had not been added at all.   If the intention were otherwise, the parties misunderstood the legal effect of the limitation clause under the circumstances, and that could not be corrected by judicial construction.   The lower court, on the second trial, found that the limitation clause was added with the intention, as to all parties, to create a several, limited obligation, and that the failure to do so was such a mistake as equity could relieve the injured

parties from, and gave judgment accordingly. The appeal from that judgment, now before us, presents several questions which will be considered in their natural order.

It is first contended on the part of appellant, that the trial court had no right to grant a new trial and permit the amendment; that the power to grant new trials in cases appealed to this court is lodged here and cannot be delegated to the lower court. Such contention is made through a misapprehension of the effect of the judgment pronounced in the mandate. That, in effect, granted a new trial, conditionally, on the equitable issue as to whether there was a mistake of the parties in reducing their agreement to writing. The condition was that the trial court should, in its discretion, permit an amendment to the answer interposed by *Mann* and *Munkwitz*, so as to properly present the equitable issue to the trial court for determination. That this court had that right, of course is not questioned. Moreover, it is not open for discussion now. It is *res adjudicata*, leaving nothing open which occurred in the case prior to the second trial, except as to whether the discretion of the trial court was properly exercised. In answer to that, respondents contend that the appellant waived all objections to the amendment and the new trial which followed, by reason of having accepted the terms imposed, the $10 costs, and retained the same, relying on the doctrine announced in *Cogswell v. Colley*, 22 Wis. 399, and many other cases in this court, to the effect that the acceptance of costs imposed as a condition of granting an order is a bar to the right of appeal. Appellant answers that costs were not imposed as a condition, hence that the rule does not apply, as held in *Fiedler v. Howard*, 99 Wis. 388, following many previous cases; therefore, if the order granted leave to amend unconditionally, and appellant was as unconditionally granted costs as terms of the favor, the acceptance of the costs in no way prejudiced the right to challenge the action of the trial

court on appeal. That answer is conclusive if the right to amend was in fact unconditional, but the exact nature of the order in that regard is rendered immaterial by what follows.

The main contention of appellant, in support of the proposition that the allowance of the amendment was error, is that defendants, having elected to make their defense at law and proceeded to a final determination of the case in the trial court, could not then change their position and insist upon a defense in equity for a reformation of the contract. The question of power was necessarily involved in the determination of this court to permit the trial court to allow the amendment. If it was error, and we feel well satisfied that it was not, it was an error of this court and cannot now be called in question. It is the unchangeable law of this case.

But it is said the surprise of counsel at the result of the first appeal in this court, which is the only excuse offered for the failure to tender the equitable issue earlier, furnished no warrant for the discretionary action of the trial court. The rule is invoked that a judgment should not be set aside and a new trial granted for the surprise or mistake of counsel. But the trial court did not set the judgment aside and grant a new trial. As before stated, the judgment was vacated by this court for error, and a new trial granted conditionally. True, the judgment, as indicated by the mandate, did not in terms grant a new trial, but it granted power to the lower court to permit an amendment to the answer, setting up the equitable counterclaim for a reformation of the contract of guaranty, and the formation of an issue on that subject, which necessarily implied a new trial of such issue when formed. Again, the rule invoked, so far as we are aware, has never been applied to the mere granting of an amendment before judgment. On the contrary, in a large majority of cases where amendments have been allowed, especially after a reversal in this court, it was to relieve the

party from the consequences of some mistake of his counsel brought to light by the decision here.

It is laid down by text writers as an elementary principle that the courts have ample discretionary power to relieve a party before judgment from the mistakes of either court or counsel. 4 Wait, Prac. 646. The cases in this court where that has been done are too numerous to mention. *Lombard v. Cowham,* 34 Wis. 486, is a good illustration. The action was ejectment, the answer a general denial. Evidence was permitted, against objection, to defeat plaintiff's claim of title on the theory that he obtained his deed by fraudulent representation. The defense on that ground prevailed. On appeal the judgment was reversed, the court holding that the defense was of an equitable nature and could be taken advantage of only by setting it up as an equitable counterclaim. The mistake in drawing the answer was clearly that of defendant's counsel, and this court, in deciding the case, said under the circumstances there should be a new trial, and, on such terms as the trial court shall deem just, defendant should be permitted to amend his answer so as to interpose the equitable defense and counterclaim. It will be noted that the judgment there went further than in this case. It judicially declared that it was the duty of the trial court to permit the answer to be amended in furtherance of justice and on proper terms, while here it was left to the discretion of the trial court whether to permit the amendment or not. In *Saveland v. Green,* 36 Wis. 612, the court held that after reversal the trial court may grant leave to amend a complaint so as to properly state a cause of action. For further examples, see *Strong v. Hooe,* 41 Wis. 659, *Harris v. Harris,* 10 Wis. 467, and *Green Bay & M. Canal Co. v. Hewitt,* 62 Wis. 316.

In each of the instances mentioned the amendment was allowed after reversal, to relieve a party from the mistakes of counsel,— not mistakes attributable to mere negligence,

but errors of judgment when tested by the judgment of this court as to the law of the case. Counsel, the most eminent in the profession, and courts from the highest to the lowest, are liable to mistakes of that kind, and it would be a most lamentable condition if our system of jurisprudence were not such that, when relief is seasonably applied for, upon proper terms and before final action in the court of last resort, injustice could be in some way prevented from flowing from such mistakes. Such mistakes are rarely beyond remedy unless a judgment stands in the way. Then the rule applies. that the judgment cannot be set aside and a new trial granted merely on the ground of a mistake of counsel on a question of law. The eminent counsel for appellant, in pressing vigorously upon the court the application of the rule to this. case, manifestly failed to distinguish between, where a judgment stands in the way of a new trial and where the judgment is yet to be rendered. In the latter situation, whether before judgment in the trial court originally, or after a reversal of it by this court, the trial court may, if the judgment here be sufficiently broad to permit it, allow an amendment to be made so as to meet the objection to the former judgment, and to that end may allow a defense improperly pleaded to be perfected by amendment, or a new defense by way of counterclaim or otherwise to be pleaded.

The first important question on the merits of the appeal is, Was the trial court warranted in saying, from the evidence, that there was a mutual mistake between the parties to the contract of guaranty in that they failed to reduce the verbal agreement made between them on the subject to writing? In considering that we are aided very much by being able to start with the conceded fact that there was but one verbal agreement, and that it was made before Mr. Johnston, cashier of the plaintiff bank, drew the first agreement. He, representing the bank, met representatives of the Wilkin Manufacturing Company, of which the respondents.

were stockholders, and they together made a verbal agreement in respect to the stockholders' guaranteeing the indebtedness then existing of their corporation, and that which might thereafter be incurred, to the plaintiff bank.   Appellant contends that the evidence shows beyond reasonable controversy that such agreement called for a joint and several promise in writing, guaranteeing to the bank the entire indebtedness of the corporation, present and future.   The respondents just as confidently contend that the evidence shows, with the same degree of certainty, that the verbal agreement was that the stockholders of the manufacturing company should be responsible for the indebtedness of their corporation only in the proportion which their holdings of stock bore to the whole paid-up capital of such corporation. Both counsel concede that the fact of mistake must be established by the most clear and satisfactory evidence, else there can be no relief therefrom through the equity powers of the court to correct it.   So the situation is such on this branch of the case that we need to determine only what the parties actually agreed to when they made the verbal agreement referred to, and compare that with the contract sued on in this case.

The evidence from the mouths of witnesses as to just what was said between the representatives of the manufacturing company, *Mann* and Fink, and the representative of the bank, Mr. Johnston, when the verbal contract was made, is as satisfactory as could be expected after such a lapse of time.   All the actors in the transactions were very busy men.   They gave their testimony after some ten years had passed, which of itself would seem to render it quite impossible for them to remember definitely what was said, and the difficulty growing out of the lapse of time was intensified by the fact that they were acting under pressure of personal interest, which of itself tends, as experience shows, to make very conscientious and truthful men differ in their relation

of a transaction, where they depend wholly upon memory. From the remembrance of the parties, merely, it would be difficult to establish what actually occurred with sufficient certainty to enable a court of equity to say the written contract, intended to express their agreement, fails to do so, and to make it conform to the truth. Of the three actors in the matter, Fink testified that Mr. Johnston said the bank, according to its rules in dealing with corporations, would require a guaranty, and that on his insisting on such security the witness stated that he would not obligate himself in excess of his proportionate interest in the corporation, to which Johnston replied that such an agreement would be satisfactory. *Mr. Mann* testified that Johnston insisted on security as a condition of further credit to the corporation, and that he expressed a willingness to sign a guaranty binding him for his proportionate interest in the corporation, whereupon Johnston said that was satisfactory and all he demanded; that they, *Mann* and Fink, expected the stockholders to sign; that they intended to become liable only in proportion to their stock, and that was what they said to Johnston. Such, in substance, is all the evidence on the part of the signers of the contract of guaranty. On the part of the bank, Johnston testified that, according to his recollection, Fink and *Mann* made the application for credit; that he stated to them that the bank would require the stockholders and directors to give a personal bond or guaranty; that they seemed to think that was reasonable, but wanted a stipulation that no stockholder should pay more or less than in proportion to his stock, so that any loss the bank might otherwise sustain would be distributed between the stockholders in proportion to their stock; that the conclusion of the conversation between him and *Mann* and Fink was that he was to draft an agreement and submit it to them.

From the foregoing, it is pretty conclusive to our minds that a person charged with the duty of placing the result of

the conversation referred to in writing, would feel bound to draw an agreement limiting the liability of the guarantors according to their respective interests in the corporation. There is nothing to evince a contrary intention upon the part of either Johnston or *Mann* and Fink, except the statement of the former that the bank wanted security, generally, but he admitted that *Mann* and Fink both replied that they wanted the agreement drawn so as to bind the stockholders only for their respective interests in the corporation. It may be that there are circumstances established by the evidence which somewhat impair the testimony of *Mann* and Fink as to some occurrences subsequent to the verbal contract, but as to what was then said they are in substantial accord with Johnston. The minds of the three seem, with reasonable certainty, to have met, if at all, on an agreement, that a contract of guaranty should be made whereby the stockholders of the manufacturing company would become responsible for the indebtedness of the corporation to the bank in the proportion which their stock bore to the paid-up stock of the company, and that is reduced to a certainty beyond reasonable controversy by what followed.

Johnston, in due time after the verbal contract was concluded, pursuant to the understanding then had, intending to express in writing for submission to the respondents and their associates what had been verbally agreed upon, drafted a form for a contract of guaranty which is set out in the statement of facts. Its importance at this point will warrant its repetition. Omitting the recitals and statement of consideration, it is as follows: "We and each of us do severally promise and agree to and with said bank to pay said bank as the said sum may become due, such proportion of said indebtedness now owing or which may hereafter be owing by said company to said bank . . . as the amount of stock owned by us in the said company bears to the whole amount of capital paid up of said company." There is no

mistaking the meaning of that language, and there is no claim made by appellant but that it clearly expresses a limited liability in all respects the same as the contract in suit would express when reformed as prayed for in respondents' equitable counterclaim. The paper thus drafted on the part of the appellant was sent to the office of the Wilkin Manufacturing Company, and after being signed by all of the stockholders except Vogel and Fink, it was returned to the bank. If the transactions in respect to the guaranty had stopped at that point, this controversy would never have arisen. Of that there can be no question, and yet we have the singular situation that appellant contends, just as vigorously as respondents, that the final written agreement upon which this suit was brought was intended to conform to the original verbal agreement. True, Johnston says he intended to draw the first agreement so as to contain a joint and several obligation to pay, and failed to get that idea into the paper. In view of his intelligence and experience, the most charitable and doubtless the right view to take of that evidence is that the absorbing activities of a busy life, during the long period that has elapsed since the paper was written, has impaired Mr. Johnston's memory of his purpose in the transaction. There is the writing, a clear, plain, and unambiguous agreement for a limited liability, made immediately after the verbal agreement was made which it was intended to express in writing. It speaks for itself. In the light of Mr. Johnston's position as cashier of the plaintiff bank, and his experience as a business man, it is a complete answer to his statement of what he intended when he drew it. Especially is that so when considered in connection with the facts that he sent the paper to the manufacturing company as expressing the guaranty agreed upon; that it was executed by the stockholders of the company; and that it was returned to the plaintiff and was retained for a time as a binding contract.

The facts stated leave no possible question as to what the verbal agreement was as understood by all parties at the time it was made. The actors in the preliminary negotiation might easily have forgotten what was said, or they might easily have drawn different inferences therefrom after the lapse of years, and the precise language used had passed from memory; but there is the paper proposed by the plaintiff, expressing what was agreed upon. It speaks with no uncertain meaning. So long as we start with the proposition that the verbal agreement was never changed, we see no escape from the conclusion that the first written agreement correctly expresses it. Appellant, with consummate ability, marshaled many subsequent occurrences tending to show that one or all of the parties understood the verbal agreement other than as expressed in the first writing; and counsel for respondents met that with equal ability, both going over a wide field which we do not feel called upon to explore, inasmuch as we fail to see any reasonable theory explanatory of the making of the first writing, other than that it was drawn just as the verbal agreement was made. It was drawn by the plaintiff's cashier with the conversation between him and Fink and *Mann* fresh in mind. He was perfectly competent to make the paper. There was nothing difficult about it. It tells a plain story. There is nothing which he did thereafter, up to and inclusive of the execution of the agreement in suit, to lead to any different conclusion. He says that when he got the first agreement back, signed, he at once sent word that he did not mean to have it signed, that it was merely a draft; but does not pretend that it did not express the verbal agreement. The inference from his testimony is that he did not intend to have the paper signed, because it was only an informal draft to be used as a guide in drawing the final instrument. He says that after giving the notice, he employed his attorneys to draw such a paper as would protect the bank; that his pur-

pose was to have an agreement that would fully protect his, corporation. The result was the instrument sued on without the clause referring to limited liability, and expressing a contract entirely different from the first writing. Immediately upon receipt by defendants of the second paper, they objected to it because of its not providing for a limited liability in accordance with the first paper. There is really no controversy at this point. *Mann* testified to it, Fink testified to it, Johnston testified to it, and so did all who said anything on the question. True, Johnston said that respondents' complaint was to the effect that there was no clause providing for a distribution of liability among the stockholders in proportion to stock, but if he correctly remembers the language used it must have referred to a distribution of liability to the bank in accordance with the first agreement, and must have been so understood by him, because no other distribution had been previously talked about, agreed upon, or reduced to writing.

Upon the objection being made, Johnston met it by promptly agreeing to insert a clause that would make the proposed paper conform to the first one, and the following language was agreed upon for that purpose: "It is understood that we are to pay any sums which may accrue hereunder in the proportion which the amounts of stock now held by each of us in said company bears in the whole amount of capital paid in by said company." The paper was then sent to the attorneys by Johnston, with directions to rewrite it with the added clause, which was done, and the completed instrument was then sent to the defendants for execution, accompanied by a letter worded as follows: "I have had a new agreement drawn up in a neat and business-like form, which I inclose herein, and which you will please get your stockholders to sign, and return the same to me. The old one was too much of a scrawl and was meant by me to be merely a copy. I will return the old one when this is signed."

There is written evidence of a previous acceptance of the
first paper except as to form, and that it was to be retained
as binding between the parties till the formal agreement
should be executed and delivered to replace it, and that the
meaning of the one was intended to be identical with that
of the other. If Johnston knew that the legal meaning of
the two instruments differed, his letter contained a fraud-
ulent representation. If he did not know it, then he was
clearly mistaken as to the legal effect of placing the limita-
tion clause after the unqualified joint and several promise.
That respondents supposed their liability was limited by the
new paper, as by the first, is conclusively shown by every
step leading up to their signing it, and substantially every-
thing that occurred thereafter. That they were free from
negligence in the matter, and that all parties believed the
added clause gave the new paper the same meaning as the
old one, is evidenced by many things that occurred there-
after, leading up to a fact that must be taken as conclusive
against any claim of negligence, i. e., the diversity of opin-
ion between the distinguished counsel representing the re-
spective parties in this action as to its meaning, the decision
of the learned trial court sustaining respondents' contention
that the meaning of the two papers was identical, and the
failure of that construction in this court on the ground that,
if the purpose of the added clause was to modify the plain
joint and several obligation which preceded it, the court was
precluded from giving it that effect without violating the
well-established rule of law that if there be two clauses in
a contract so totally repugnant that they cannot stand to-
gether the first will be received and the last rejected. To
the credit of Mr. Johnston and his attorneys who assisted
him in putting the paper into shape for execution, we may
say, fairly, from the whole case that they probably did not
perceive the legal consequences of writing the limitation
clause in the order it was placed, without such connection

as to require it to be constructively included in the principal clause. It is easier to believe that they were mistaken than that they intended any deception. The circumstances point to good faith rather than otherwise. The character of all the parties strongly protects them, and the trial court decided that it was all a mistake, which we affirm.

To recapitulate on this branch of the case, starting with the fact that the verbal guaranty made before the first paper was drawn was never changed, but was intended by the parties, from first to last, to be expressed in the written agreement, the drawing of the former paper containing an agreement for limited liability, the drawing and submission of the second containing a joint and several unlimited promise, the attempted modification of it in that regard when objected to by respondents, for the purpose of making it conform to the original agreement, the letter submitting the completed second paper to respondents and their associates, admitting the receipt and acceptance of the first paper as binding till exchanged for the second, and asserting in effect that there was no difference between the two except as to form, furnish clear, conclusive written evidence that the agreement which the parties intended was one for a limited liability as expressed in the first paper. The fact that all stockholders were not required to sign cannot be allowed to vary the plain language used by the parties, neither can the fact that one or more signed who were not the holders of paid-up stock. No name is mentioned in either paper. True, it contemplated signatures by stockholders only, but if those signed who were not such, though the circumstance might aid in its construction if there were any ambiguity in the language used, there is no ambiguity. The difficulty is not in that, but in the fact that the limitation clause was inserted, following a clause so repugnant to it, on appellant's theory of its meaning, that it had to be rejected so far as affecting the guarantee. Moreover, it fairly appears from

the evidence that both Wilkin and Morris, held by the court not to be stockholders, had made subscriptions to stock, and their subscriptions had been accepted by the corporation. Therefore they properly signed the agreement as stockholders. The fact that they had not paid for their stock and received certificates therefor was not essential to their being stockholders in fact. But whether they were such within the meaning of the agreement is not before us. The trial court decided they were not. Respondents are the only ones prejudiced by that decision, and they are not complaining of it, and are in no situation to do so, though in considering the circumstance of Wilkin and Morris signing we may look to their situation to see whether their conduct was consistent with their relations to the company and the calls of the paper.

So, substantially all events leading up to the making of the paper, as well as those which followed, notably, in the last category, requests from time to time for information as to the stockholders, the final refusal to loan money to the manufacturing company without the personal indorsement of *Mann*, the setting up in the complaint at the commencement of the action of the facts in regard to the respective holdings of stock by the defendants, seem to leave no ground to stand on in support of plaintiff's claim as to what the original agreement was. Some attempt was made to explain the circumstance of alleging the situation of defendants as regards being stockholders, which was as successful as could reasonably be expected, in view of the fact that the subject had no necessary place in the complaint on appellant's theory of the contract, and that the high professional standing of counsel who drew it precludes even a suspicion that they stood in any need of instruction on that point. The complaint is consistent only with the theory that the understanding of the plaintiff's officers and their counsel was that the signers of the paper sued on intended to incur a limited

liability, but that the written evidence of it might have to be construed differently, and, in that, subsequent events have demonstrated their wisdom.

We now come to the subject of whether the mistake in drawing the contract of guaranty was one from which a court of equity could relieve respondents. On that, appellant invokes the familiar principle that a mistake of law without fraud is without remedy in equity. That rule is subject to so many important exceptions that it needs restatement in order to be readily understood from the language used. The mistake of law which is not the subject of relief in equity is mistake as to the legal result of known facts, by reason of some misapprehension of the legal meaning of the language used; not mistake in reducing to writing an agreement upon which the minds of the parties previously met in making a preliminary verbal agreement. The latter is a mistake of law in one sense, not a mistake of law as to what the parties wanted to do in drawing the paper, but rather as to the appropriate language to accomplish their intention. If it were the former they would be remediless in equity under the rule under discussion. But if the latter, it is not, and has not been, considered within that rule, since the true scope of it was definitely worked out in the development of equity jurisprudence. In the one case there is a mistake in the making of the verbal contract growing out of misconception as to the legal scope or effect of known facts; in the other there is no mistake whatever as to the contract actually made, but a mistake in the legal import of the language used in reducing that contract to writing. A mistake in the contract itself, springing from ignorance of law, is one thing, and mistake in the legal meaning attributable to words used to express a contract is quite another. The rule may be properly stated thus: Where there is a mutual mistake, either of fact in the making of a contract, or of law or fact in the reduction of the

contract to writing, the person injured thereby may have it reformed in equity in accordance with the truth, in the absence of facts or circumstances constituting a waiver of the remedy or an estoppel to the assertion of it.

This subject is by no means new in this court, as shown by numerous cases cited in respondents' brief, but if it were otherwise, the rule is too well settled to require any extensive discussion of it. In *Green Bay & M. Canal Co. v. Hewitt,* 62 Wis. 316, a deed intended as a conveyance of an undivided interest was erroneously drawn so as to convey the whole title. That occurred by placing the limitation clause after an unqualified granting clause conveying the whole title, so that the latter clause was necessarily rejected. The mistake was as to the legal effect of placing a limitation clause, clearly repugnant to the preceding granting clause, so expressed that the one could not be considered included in the other. The result was precisely the same as in this case, and grew out of an error of the same kind. The instrument failed to correctly express what was intended through a mistake of law, not in the making of the preliminary verbal contract, but in properly expressing it in legal language. This court said, in that situation, that the mistake was remediable in equity, and that it was singular that there should have been any conflict of decisions on that question. To the same effect are *Silbar v. Ryder,* 63 Wis. 106, and *Whitmore v. Hay,* 85 Wis. 240.

The following rule is laid down by standard text writers, substantially copying the language of Mr. Justice WASHINGTON in *Hunt v. Rousmaniere's Adm'rs,* 1 Pet. 1, and has been frequently approved by this court: Where an instrument is drawn or executed, which professes or is intended to carry into execution an agreement previously entered into, but which, by mistake of the draftsman either as to fact or law, does not fulfill that intention, or violates it, equity will correct that mistake so as to produce a conformity to the agree-

ment. So it is said in *Beardsley v. Knight*, 10 Vt. 185:
Where there is a mistake in reducing an agreement to writ-
ing, equity will correct it whether the parties failed to make
it in the form intended, or misapprehended its legal effect.
In Pomeroy, Eq. Jur. §§ 843, 845, the same rule is stated in
somewhat different language, as follows: "Where the par-
ties, with knowledge of the facts, and without any inequi-
table incidents, have made an agreement or other instrument
as they intended it should be, and the writing expresses the
transaction as it was understood and designed to be made,
. . . equity will not allow a defense or grant a reforma-
tion or rescission, although both parties may have mistaken
or misconceived its legal meaning, scope, and effect." But,
"if, on the other hand, after making an agreement, in the
process of reducing it to a written form the instrument, by
means of mistake of law, fails to express the contract which
the parties actually entered into, equity will interfere with
the appropriate relief, either by way of defense to its en-
forcement, or by cancellation, or by reformation, to the same
extent as if the failure of the writing to express the real
contract was caused by a mistake of fact." To that text
the author cites abundance of authority. Indeed, the rule
is so firmly established that a discussion of it to such great
length is hardly warranted.

Many cases may be cited to support the contention made
by appellant's counsel, that a mistake of law is not reme-
diable in equity, but they do not fit this case. They refer
to a mistake of law in the making of the verbal contract
as distinguished from a mere mistake in reducing the con-
tract to writing through some misapprehension of the legal
meaning of the language used. The rule applies where
the contract is written so as to express the agreement as
understood, though the understanding were wrong through
ignorance of law; it does not apply where the contract is
fully understood but is incorrectly expressed in the writing

through ignorance as to the legal import of the language selected by the parties for that purpose. Though there is some confusion in the adjudicated cases, through failure to correctly make the distinction referred to, it is so well defined that accuracy in the application of the legal principles involved may be obtained without serious difficulty. There is reason to say that the distinction was not clearly made in *Neff v. Rains*, 33 Wis. 689, where the court said, in effect, that if the parties agree upon a guaranty of collection, and in reducing it to writing make a guaranty of payment through ignorance of the legal meaning attributable to the words used, it is irremediable in equity. That seems to be contrary to numerous cases subsequently decided, to which we have referred.

Counsel say that in *Green Bay & M. Canal Co. v. Hewitt*, 62 Wis. 316, the mistake was one of fact, but a reference to the opinion shows quite conclusively that it was treated as a mistake of law. It was a mistake in the legal effect of the language used in reducing the contract to writing. The court said it was sometimes called a mistake of fact and sometimes a mistake of law, but that it made no difference whether it was called the one or the other, it was a situation from which the parties could be relieved in equity, and that is true whether the parties themselves selected the language to express the contract in writing without the aid of a draftsman, or whether they selected a third party to do it for them.

Appellant's counsel suggest that the rule does not apply except where a draftsman is selected and the mistake is made by the third party, but that is not supported by either reason or authority. The initial question is, What was the verbal agreement the parties actually made? Not what they thought they made, or intended to make, but What did their minds meet upon? That having been settled, if, by mutual mistake, they failed in reducing it to writing to use language

suitable to express it, equity will correct the writing, in the absence of circumstances to prevent a resort to the equitable remedy.

The sole remaining question is, Are the findings and judgment fatally defective for failure to state the exact change of language requisite to be made in the written contract in order to make it conform to the verbal contract? Appellant's counsel contend that they are, and invoke a rule, good in some cases, but not in one like this. Where a failure to actually reform the instrument will work some injury, it is a proper subject for review on appeal. Cases cited by appellant where reformation of a conveyance of land was sought belong to that class. It is important to have mistakes in an instrument forming part of a chain of title actually reformed by having written into it the language necessary to make it conform to the intention of the parties. But here the contract has been executed, the effect of the instrument as reformed has passed into judgment, and there is no further use for it whatever. Nothing in which plaintiff is interested depends upon having the exact words requisite to a reformation of the contract determined and inserted in it. So, if the trial court erred in failing to actually reform the instrument before entering judgment, it is a mere irregularity, working no injury or prejudice whatever to appellant, therefore it is no ground for a reversal of the judgment. *Scott v. Webster*, 44 Wis. 185; *Dousman v. Wis. & L. S. M. & S. Co.* 40 Wis. 418; *Pormann v. Frede*, 72 Wis. 226; *Bilgrien v. Dowe*, 91 Wis. 393. Sec. 2829, R. S. 1878, applies: "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect." That has often been said to cover a multitude of harmless errors. It promotes quietude and peace between

litigants when their substantial rights have been effectually protected by the judgment.

The foregoing covers all questions that are considered of sufficient importance to require mention in this opinion. The facts forming the subject of controversy are established by the evidence beyond reasonable controversy. The legal conclusions drawn from such facts by the trial court were correctly drawn. Substantial justice has been done by the judgment that was pronounced and from which the appeal was taken. It must be affirmed.

*By the Court.*— So ordered.