Atkinson, J.,
delivered the opinion of the court:
This is a suit arising under a contract to build a 500-foot dam (No. 4) on the Ohio River, on the unit-price plan, all *124 materials to be furnished by the contractor except the cement. The original contract was executed July 6, 1901, and a supplemental agreement changing the size of the cofferdam and fixing new prices for the changed conditions was executed May 3, 1902. On May 5, 1904, a second supplemental agreement was entered into of which the part material to the case before us reads as follows:
“That the contract dated July 6, 1901, and supplemental contract dated May 3, 1902, for constructing chanoine dam at Dam No. 4, Ohio River, after the completion of the first 250-foot section of the dam, including the removal by the contractor, at his own expense, of the cofferdam on or before June 1, 1904, to the satisfaction of the engineer will be and hereby is abrogated by mutual consent without prejudice to either party.”
The original contract provided that the Government engineer in charge of the work should fix the length of the dam to be completed the first year, so as not to obstruct the navigation of the river, and the remainder of the dam was to be left for the next year’s work. Work was to begin within 60 days after the approval of the contract, and the contract work was to be completed by November 30, 1902; but allowances were to be made for freshets in the river, days in which no work could be done, and all the time between December 1 and April 30 of each year on account of possible rises and ice in the river. The first season’s work resulted in the construction of the greater part of the cofferdam inclosure; but when winter came on, rises in the river washed out the cofferdam and practically rendered useless nearly all the work that had been done. The Government engineers in charge of the work, however, believing that they were at least in part responsible for this loss, the contractor was paid therefor.
Owing to a change in the bed of the river, resulting from scouring by high water, it was decided to change the plan of construction, and a supplemental contract was made and entered into, as before stated, on May 3, 1902, by which the contract period was extended 60 working days. Under this supplemental contract the claimant company proceeded with the execution of the work; but owing to many apparent unavoidable delays it failed to complete the first half of the *125 permanent work until November 10, 1903, at which time it had all of the first section of the cofferdam yet to remove, and had remaining only about 22 days of the time allowed for the entire completion of its contract. Claimant company, on August 24, 1903, asked for an extension of 120 working days for the completion of its contract. This request was refused by the Government engineers in charge of the work, .and on August 31,1903, claimant was instructed not to begin the cofferdam construction for the remaining half of the dam. The reasons for this action of the Government engineers were (1) the fact that with the cofferdam for the first half section of the work still standing in the river the construction and existence of the cofferdam for the second section of the work would interfere with the navigation of the river by reducing the navigable pass of the same for such vessels as were engaged in commerce on said river, and (2) they were of the opinion that claimant could not complete the remaining half of the necessary work or any material part thereof before the opening of the winter season or during the remainder of the contract period.
No further work was done by claimant under its supplemental contract outside of the completion of the first half section of the dam covered by the original and supplemental contracts; and on May 5, 1904, the second supplemental agreement was entered into, which provided for the abrogation of the two preceding contracts or agreements, the defendants paying claimant for all work done by it, and agreeing to pay and did pay a price agreed upon between them for certain materials belonging to claimant which remained unused at the works. Upon this basis final settlement between the parties was made.
Claimant in its petition asserts two items of claim arising between the order of August 31, 1903, directing that work should not be commenced on the cofferdam for the remaining half of the dam, and abrogating the contract of May 5, 1904, as follows: For loss of profits on work which might have been completed, $30,688.93, and for expenses incurred between December 15, 1903, and June 1, 1904, the order of suspension of all work under the contract and its abrogation, for maintenance of the work and its plant, $7,004.53; *126 and averring further that the abrogation stopped the incur-rence of further obligations or the origin of further rights, but that the clause “ without prejudice to either party ” contained in the abrogation agreement, which we have herein quoted, saved the rights of either party then in existence.
On the 13art of the defendants it is contended: First, that it was the intent and understanding of both parties by the supplemental and abrogating contract of May 5, 1904, that it should provide for and constitute a full and final settlement of the whole controversy between the parties, and relieve each from any liability to the other on account of any of said contracts or contract work; and that the said abrogating contract should therefore be reformed to so state, and the claimant’s petition accordingly be dismissed. Second, that even if said contract were not so re-formed there could be no recovery against the Government, for the reasons (1) that the Government acted throughout within its rights in the premises, and (2) that no loss by the claimant properly chargeable to the Government has been established by the evidence to have resulted from the Government’s action in the matter.
.These opposing contentions between the parties herein directly raise the question as to whether there was mutual mistake in framing the supplemental abrogating contract of May 5, 1904. Was it their understanding and agreement that said contract should constitute a full and conclusive settlement of all matters, rights, and liabilities growing out of the several contracts for the construction of the dam in question; and was the phrase “without prejudice to either party ” used with the understanding and belief that its legal effect would be to finally close all transactions between them, without recourse on either party? This the court has found as a fact was the mutual understanding of both of the parties.
The findings reveal conversations and verbal statements, and the passing of several letters between the parties in interest which show the failure of claimant to perform the work within the time provided by the original contract; the extension of time granted by the first supplemental contract, Avith failure of claimant to comply therewith; negotiations *127 which enabled the parties to arrive at a definite conclusion and understanding; and finally the signing of the abrogating contract by which the Government released claimant from all responsibility in connection with the work and upon terms apparently satisfactory to both parties to the contract; which lead us to conclude that were it not for the phrase “ without prejudice to either party ” this ' suit, doubtless, would not have been instituted. It seems clear, therefore, that there was a mutual understanding between the parties that the abrogating contract was to settle and conclude all the rights and liabilities whatsoever of both parties, and that the use of said provision “ without prejudice to either party ” was a mutual mistake as to its meaning and effect.
Since the passage of the act of March 3, 1887 (24 Stats., 505), this court has been clothed with equity power sufficient to deal with the question of the re-formation of a contract, so as to effectuate the full intention of the parties, and the only question for us to determine in this case in that connection is whether the mistake made in the reduction of the abrogating agreement to writing is such a mistake as can be corrected by re-formation; and this question we decide in the affirmative. {South Boston Iron Work Co. v. United States, 34 C. Cls., 174; United States v. Milliken Imprinting Co., 202 U. S., 168.)
If both parties to a contract mutually agree what its provisions shall be, and the same is reduced to writing and both parties thereto sign the same, believing it to express what they had mutually agreed upon, when in fact its language gives it a different legal effect from that mutually intended; or, in other words, when the contract contains language having a different legal effect from that agreed upon and understood by the parties, such contract can be re-formed by a court of equity to make it conform to the intention of the parties thereto.
As a general rule, both at law and in equity, mistakes of law do not furnish an excuse for wrongful acts or a ground of relief from the result of acts done in consequence of such mistakes; But when both parties are under a common mistake of law in the use of a certain term or terms in the framing of a written contract, it is the duty of courts of *128 equity to afford relief from the consequences of such mutual mistakes of parties in the reduction of their agreements to written form, both as to mistake of law as well as of fact.
Courts will correct an instrument when it is inconsistent with a prior or antecedent agreement and the purpose for which it was designed, or if it fail to express the intention of the parties; but a mistake sufficient to justify the reformation of a contract must be the mistake of both parties, and not that of one only. In short, all text writers substantially agree that where there' is a mutual mistake, either of fact in the making of a contract or of law or fact in reducing a contract to writing, the person injured thereby may have it re-formed in equity in accordance with the truth. (Pomeroy on Eg. Juris., sec. 845; Story’s Eg. Juris., secs. 112-115, 136-138 f.; Page on Contracts, sec. 1241; Wisconsin Marine, etc., Bank v. Mann, 100 Wis., 596, 617-621; Hunt v. Rousmaniere, 1 Pet., 12; Hall v. La Fayette Co., 69 Miss., 529, 539; Walden v. Skinner, 101 U. S., 577, 583.)
The case of Wisconsin Marine F. I. Co. Bank v. Mann et al. (100 Wis., 596, 617) contains a clear elucidation of the rule involved herein. The re-formation allowed in that case was that of a contract of guaranty. In discussing the case the court said:
“We now come to the subject of whether the mistake in drawing the contract of guaranty was one from which a court of equity could relieve respondents. On that appellant invokes the familiar principle that a mistake of law without fraud is without remedy in equity. That rule is subject to so many important exceptions that it needs restatement in order to be readily understood from the language used. The mistake of law which is not the subject of relief in equity is mistake as to the legal result of known facts, by reason of some misapprehension of the legal meaning of the language used, not mistake in reducing to writing an agreement upon which the minds of the parties previously met in making a preliminary verbal agreement. The latter is a mistake of law in one sense, not a mistake of law as to what the parties wanted to do in drawing the paper, but rather as to the appropriate language to accomplish their intention. If it were the former, they would be remediless in equity under the rule under discussion. But if the latter, it is not and has not been considered within that rule, since *129 the true scope of it was definitely worked out in the development of equity jurisprudence. In the one case there is a mistake in the making of the verbal contract growing out of misconception as to the legal scope or effect of known facts; in the other there is no mistake whatever as to the contract actually made, but a mistake in the legal import of the language used in reducing that contract to writing. A mistake in the contract itself, springing from ignorance of law, is one thing, and mistake in the legal meaning attributable to Avords used to express a contract is quite another.”
In Hall v. La Fayette Co. (69 Miss., 529) the Supreme Court of Mississippi held (pp. 539-540) :
“Where parties contract for a.particular result, and intend to effect it, and fail to accomplish it, either through ignorance or mistake of law, equity will effectuate the intent of the parties. If an agreement is just what the parties intended it to be, no matter what led to it, there can be no interference with it; but if, in putting it into form, it fails to express and stipulate for what the parties understood and intended it should be, a case is made for a court of chancery.”
In the case of Bonbright v. Bonbright (125 Iowa, 305) suit AYas brought to re-form an antenuptial contract so as to make it a lien on all the husband’s property owned or acquired by him both prior and subsequent to the contract. Re-formation was granted; and in the opinion the court said:
“Re-formation of the contract by the trial court is complained of, first, because there was not sufficient evidence on Avhich to base such relief; and second, because the mistake, if there was one, was of law and not of fact. It is now well settled in this State that a court of equity will re-form a contract even where, through mistake of law, it does not express the true intent of the parties thereto. (Bottorff v. Lewis, 121 Iowa, 27; Hausbrandt v. Hofler, 117 Iowa, 102.)”
It was decided in the case of Pitcher v. Hennessay (48 N. Y., 415) that—
“ Where parties, to carry out their contract, agree to use an instrument which, by their mistake of the laAv, will not effectuate their intention, equity Avill re-form the instrument or substitute another; but where parties intending to reduce a parol agreement to writing, and because they are ignorant *130 of the force of language and misunderstood the meaning of the terms used, making a contract different from that designed, equity will grant relief by re-forming the instrument and compelling the parties to execute and perform their agreement as they made it. It matters not whether such a mistake be called one of law or of fact.”
See also Maher v. Insurance Co. (67 N. Y., 283, 288-291), which is to the same effect, and is directly in point with the case at bar; Stockbridge Iron Co. v. Hudson Iron Co. (107 Mass., 290).
The cases of Hunt v. Rousmaniere, supra, and Bank of United States v. Daniel (12 Pet., 32), strongly relied upon by the claimant, are not in point here. In each of those cases the mistake was in the agreement itself, • while here the mistake was not in the agreement between the parties, but merely in the reduction of the agreement to written form.
In Hunt's case the mistake was in the agreement by the parties upon a power of sale, instead of a mortgage, as security for a debt, after a full consideration of both of these forms of security, which agreement was correctly carried out and embodied in the written instrument sought to be re-formed. The instrument being precisely what the parties had agreed upon, there was no ground for re-formation, and especially where the mortgage form of security, into which the power of sale was sought to be re-formed, had been fully considered and rejected by the parties, in favor of the power of sale. As stated in the opinion of the court (p. 16):
“Where the parties, upon deliberation and advice, reject one species of security and agree to select another, under a misapprehension of the law as to the nature of the security so selected, a court of equity will not, on the ground of such misapprehension, and the insufficiency of such security in consequence of a subsequent event, not foreseen, perhaps, or thought of, direct a new security of a different character to be given.”
The lack of analogy between this case and the case at bar is further shown, and our interpretation of the rule in question is clearly supported by the opinion in the case, in which the court says (p. 12) :
“ Where an instrument is drawn and executed, which professes, or is intended, to carry into exécution an agreement, *131 whether in writing or by parol, previously entered into, but which, by mistake of the draftsman, either as to fact or law, does not fulfill, or which violates the manifest intention of the parties to the agreement, equity will correct the mistake, so as to produce a conformity of the instrument to the agreement.”
In the case of Bank of the United States v. Daniel, supra, the mistake was not, as in the case before us, a mistake in the reduction of the agreement to writing, but was in the making of the agreement itself, and was due to ignorance of law, by reason of which the parties seeking by re-formation had agreed and bound themselves, in the instrument of which reformation was sought, to pay to the adverse party a sum of money, as damages, which was erroneously thought to be chargeable under the laws of the State. The instrument sought to be re-formed embodied and expressed precisely the understanding and agreement between the parties; hence there was nothing in the instrument to be corrected. The mistake was in the making of the agreement, and not in the reduction of it to writing. It is apparent, therefore, that this case bears no analogy to the case at bar, and is therefore not controlling.
The mistake contemplated by the rule that equity will not relieve for mistake of law is a mistake in the agreement itself between the parties, due to some ignorance or misconception of the law on their part, and not a mistake in the reduction of such agreement to written form. In other words, as we have hitherto stated, equity will not relieve against mistake of law in the making of an agreement; but it will relieve against either mistake of fact or mistake of law in the reduction of the agreement to written form.
We have examined the numerous authorities relied upon by claimant’s able counsel, and while there is some variance in different jurisdictions as to the interpretation and application of the rule in question, yet few, if any, of the decisions and opinions cited for the claimant directly bear upon the question at issue in this case.
Ke-formation of the contract as prayed by the defendants must be granted; and as the claimant company is concluded by the contract as re-formed, there can be no recovery.
Petition dismissed.