ELIZABETH COLEMAN, v. WM. P. COLEMAN, and ELIZABETH COLEMAN v. TIMOTHY J. COLEMAN.

**Reformation of instruments: PLEADINGS: OBJECTION TO SUFFICIENCY.**
1  The petition in an action for the reformation of a written instrument to make it conform to the agreement of the parties must distinctly set out the original agreement and show what part of the agreement was not included in the writing, or what part of the written contract was not embraced in the original agreement. But where no objection to the sufficiency of the petition is made upon the trial, and both parties proceed on the theory that the issue of mistake was properly pleaded and they acquiesced in the determination of that question, they are bound by the adjudication and can not raise that question on appeal.

**Same: PAROL EVIDENCE.** In a suit to reform a written contract to
2  make it conform to the agreement of the parties the rule forbidding the admission of parol evidence to vary the terms of the writing is not applicable, but the conversations and understandings of the parties prior to the execution of the writing are admissible for the purpose of determining the real agreement of the parties.

**Evidence:** CONVERSATIONS WITH A DECEDENT: WAIVER OF OBJECTION. Where the competency of a witness to testify to conversations with a deceased person is not challenged upon the trial the objection will be deemed waived.

**Reformation of instruments:** EQUITABLE JURISDICTION. Where part of the agreement of the parties was omitted from the writing through an oversight or ignorance of the import of the language used by the scrivenor, or the understanding of the parties was not evidenced by the writing, equity will reform it to make it conform to the real agreement.

**Same:** LACHES. Where nothing had transpired to indicate that the parties to a written contract understood it differently until suit was instituted thereon, when a mistake was promptly asserted and a reformation prayed, the right to reformation was not barred by laches.

**Same:** EVIDENCE OF MISTAKE IN WRITING. The evidence in this action is reviewed and held sufficient to justify the reformation of a written contract to make it conform to the real agreement of the parties.

*Appeal from Webster District Court.*—HON. R. M. WRIGHT, Judge.

MONDAY, DECEMBER 18, 1911.

SOME time prior to his death, which occurred August 19, 1901, Jeremiah Coleman, Sr., was afflicted with a malady which he was aware would soon prove fatal. He owned two farms in Webster County, one containing one hundred and sixty acres, on which he lived, and another one hundred and twenty acres, across the road, occupied by his son Timothy J. Coleman. Wm. P. Coleman, youngest of ten children, was unmarried, and resided with his parents. The eldest son, Jeremiah Coleman, Jr., and the seven daughters, had long since married and left home. On June 12, 1901, Jeremiah Coleman, Sr., his wife, Elizabeth, joining, conveyed the one hundred and sixty acres subject to an incumbrance of $500 to William and the one hundred and twenty acres subject to incumbrance of $800

to Timothy by separate warranty deeds, reciting in each the consideration as $1. At the same time, and as a part of the same transaction, an instrument in words following was executed:

  Agreement of lease, made this day between Timothy J. Coleman and Mary Coleman, his wife, of the county of Webster, and state of Iowa, of the first part, and Jeremiah Coleman, Sr., and Elizabeth Coleman, of the county of Webster, in the state of Iowa, of the second part, witnesseth: That the said parties of the first part has this day rented to the party of the second part the following described premises, situated in the county of Webster, in the state of Iowa, for the term of twenty years, but to terminate at the death of both of the two second parties: The southeast one-fourth of the northeast one-fourth, and the north one-half of the southeast one-fourth, of section 3, Jackson township, Webster County Iowa. This lease given to secure to second party the payment of two hundred dollars ($200) yearly, which first parties agree to pay to said second parties until the death of both of second parties, these being the conditions upon which second parties have deeded to first parties the property above described. On the following terms and conditions, to wit: For the rent of said premises, the said party of the second part hereby agrees to pay to the said party of the first part one and no/100 dollars, said rental to be paid promptly, as follows: [Here followed the terms generally found in a farm lease and it ended.] In witness whereof, we have hereunto set our hands this 15th day of June, 1901.

Timothy Coleman.

Mary Coleman.

    his

Jeremiah X Coleman, Sr.

    mark

    her

Elizabeth X Coleman.

    mark

  An instrument exactly like the above, concerning different land, and save that Wm. P. was named and signed as party of first part, instead of Timothy and wife, and

the amount of payment was $300 per annum, instead of $200, also was executed.

After the death of Jeremiah Coleman, Sr., William, with his mother, continued in occupancy of the one hundred and sixty acres until the spring of 1903, when the land was rented, and they moved to Des Moines. About $500 was realized from the sale of horses and farm implements and $530 was received in advance for a year's rent, and with this and some borrowed money a lot with three houses on it in Des Moines was purchased. Two of these houses were rented and the other occupied by them. Out of such rent and William's earnings as an employee of the street railway company they lived, she keeping house for him until May, 1905, when he married. The plaintiff continued to make her home with William until some time after he moved back on the farm in 1908. He sold the Des Moines lot, realizing therefrom $1,650, out of which he paid an indebtedness of about $450 and had used most of the remainder. Up to the time of his marriage the mother performed all the work incident to keeping house for William, and thereafter aided his wife in so doing. During this period she was unusually strong and healthy for one of her years, and all she received from him was money used in meeting the expenses of the family, purchasing clothing, and to pay her railroad fare when she visited her daughters. Timothy had given her a pair of shoes and $6, half of which she claims to have returned. On May 13, 1909, she left William, and took up her residence with a daughter, Mrs. Passou. Shortly afterwards payment of the amounts stipulated in the contracts was demanded, and, not being paid, an action was begun against each of defendants. Each defendant pleaded several defenses, and by way of cross-petition prayed that the contracts be reformed so as to include conditions that payment of the sums promised should not be made save when the mother ceased to make her home with one of defendants.

The causes were consolidated, and, upon hearing, the contracts were treated as though reformed as prayed, and judgment entered against each for the respective proportions of the annual payments that the time intervening between the departure of plaintiff from William's home and the bringing of the actions bears to one year.   The plaintiff appeals.—*Affirmed.*

*Healy & Healy,* for appellant.

*Mitchell & Fitzpatrick* and *Kelleher & O'Connor,* for appellees.

LADD, J.—The farms were in the name of Jeremiah Coleman, Sr., who died August 19, 1901.   Prior thereto, on June 12th of the same year, he conveyed the farm on which he resided to his youngest child, William, then single and twenty-six years of age, reciting in the deed that the consideration was $1.   On the same day he executed a similar deed for one hundred and twenty acres of land then occupied by the grantee to his son Timothy, who had been married several years, and was third youngest of the family, and thirty-two years of age.   His eldest son and seven daughters were all married, and had long since left home. As a part of these transactions an instrument denominated a lease was entered into by the deceased and William and another of like import by deceased and Timothy.   Each of these contained the following stipulation, save that in the one signed by Timothy the amount to be paid was $200, while in that of William this was $300:   "This lease given to secure the second party the payment of three hundred dollars ($300) yearly, which first party agrees to pay said second party until the death of both of second parties, these being the conditions upon which second parties have deeded to first parties the property above described."   The plaintiff as wife of deceased joined him in executing the

deeds and also in signing these instruments, wherein they are designated as parties of the second part. Jeremiah Coleman, Sr., was then afflicted with a malady which, as he must have anticipated, soon proved fatal. At about the same time he paid or caused to be paid $50 each to his eldest son and the daughters, either as a gift or as what he intended as their shares in his estate. His widow, the plaintiff, continued to reside at the same place with William until 1903, then accompanied him to Des Moines, where they remained five years, and returned with him to the farm, but left May 13, 1909, and has since made her home with a daughter. During the period of her residence with William, she was well cared for, and, notwithstanding some intimations to the contrary contained in the record, was supplied with sufficient funds for clothing, traveling expenses, and other necessaries. Neither Timothy nor William question their obligation to pay the yearly sums as provided in the contracts since she left William's home; but to her demand for payment of such sums since the execution of the contracts several defenses are interposed, and in cross-petitions they assert that by mutual mistake there was omitted from each contract a provision that it was executed to secure plaintiff a home, and that the amount specified therein was to be paid yearly only in event that a home was not furnished her by William or Timothy, and defendants prayed that the contracts be reformed so as each shall include the same.

Appellants argue that the pleadings are insufficient to raise this issue, in that the cross-petition does not set forth in complete terms the original agreement and also that reduced to writing, and point out with

1. REFORMATION OF INSTRUMENTS: pleadings: objection to sufficiency.

clearness wherein there was a mistake. Undoubtedly the rules of good pleading exact that a party requesting that a contract in writing be remodeled so as to express the true understanding of the parties shall embody both the defective instru-

ment and the real agreement in his pleading. The petition should "clearly and distinctly state what was the contract or agreement between the parties, and show what part of the contract was omitted to be reduced to writing, or what portion of the contract as it was expressed in writing was not embraced in the original contract. The plaintiff's allegations must show in terms what the tenor of the instrument ought to be to express the contract which by mistake there was a failure to execute. It is not sufficient to allege that it was the intention of the parties to make an instrument that would accomplish a certain object, and ask the court to make a writing that will accomplish that object." 18 Ency. P. & P. 824. In other words, the transaction as it occurred, and not its legal effect, should be alleged. In *Foster v. Schmeer,* 15 Or. 363 (15 Pac. 626), the court in holding that the plaintiff's allegations were insufficient said: "He would ordinarily have to set out the terms of the contract as the parties made it, what they each undertook and agreed to do, and show why its terms happened to be left out when it was attempted to be reduced to writing or how terms not agreed upon came to be inserted." In *Hyland v. Hyland,* 19 Or. 51 (23 Pac. 811), the court observed that "attorneys who prepare complaints to reform written instruments are too apt to state conclusions instead of facts. They should set out the transaction as it occurred, and not the legal effect thereof. The complaint in this case should have stated what the parties mutually agreed to do in regard to the exchange of their lands, and not the result of what they did do." In *Citizens' Nat. Bank v. Judy,* 146 Ind. 322 (43 N. E. 259), the rule is laid down that, "in an action to reform a written contract, the plaintiff must set forth the terms of the original agreement, and also the agreement as reduced to writing and point out with clearness wherein there was a mistake." Mr. Justice Story, speaking in *United States v. Munroe,* 5 Mason, 572 (Fed. Cas. No. 15,835), observed that: "If

the bill asks to correct an asserted mistake in the language of the instrument differing from the intention of the parties, and reform the instrument and obtain the consequent relief, it is not sufficient to allege generally that the intention was different, but there must be an express averment that the instrument as existing differs from the intention of the parties, stating the particulars, and the bill must conclude with a prayer for the correction of the mistake and a decree according to the reformed instrument." See, also, *Thompsonville Scale Mfg. Co. v. Osgood,* 26 Conn. 16; 34 Cyc. 971. The rule that in an application to a court of equity to remodel a contract so as to conform to what the parties thereto intended the agreement actually made and that which the parties intended must be alleged together with a statement of the ground upon which prayer for reformation is predicated seems to be without exception and generally approved.

But the appellant is not in a situation now to challenge the insufficiency of the cross-petition in these respects. No objection was made to the petition on this ground in the district court. Evidence was introduced by both parties on the theory that the issue was properly raised by the pleadings, and, whether the contracts should be reformed, having been heard and determined without objection and with the acquiescence of all parties, they are bound by the adjudication precisely as though the pleadings had been in proper form. *Beach v. Wakefield,* 107 Iowa, 567; *Caldwell v. Drummond,* 127 Iowa, 134; *Fox v. Waterloo Nat. Bank,* 126 Iowa, 481; *Osborne v. Metcalf,* 112 Iowa, 540; *Gregory v. Bowlsby,* 126 Iowa, 588; *Schopp v. Taft,* 106 Iowa, 612; *Hoyt v. Hoyt,* 68 Iowa, 703; *McLeod v. Thompson,* 138 Iowa, 305; *Marengo Sav. Bank v. Kent,* 135 Iowa, 386.

II. To all of the evidence of conversations and understandings had by the parties to the contract prior to and at the time of their execution plaintiff objected on the

grounds that these were merged in the written agreements,

2. SAME: parol evidence. and that such evidence tended to vary and contradict the written instruments. Resort to such evidence would seem the only way to establish the existence of the mistake alleged, and, for this reason, the ordinary rule forbidding the admission of parol testimony to vary the terms of a written instrument is held not applicable in such actions. *Hunter v. Bilyeu,* 30 Ill. 228, 247; *Peterson v. Grover,* 20 Me. 363; *Canedy v. Marcy,* 13 Gray (Mass.) 373; *Davenport v. Sovil,* 6 Ohio St. 459; *Walden v. Skinner,* 101 U. S. 577 (25 L. Ed. 963), where it was said: "Courts of equity afford relief in case of mistake of facts, and allow parol evidence to vary and reform written contracts and instruments when the defect or error arises from accident or misconception as properly forming an exception to the general rule which excludes parol testmony offered to vary or contradict written instruments." Were it otherwise, a rule of evidence adopted by the courts as a protection against fraud and false swearing would become the very instrument of the evil it was intended to prevent. *Allen v. Hutchinson,* 45 Wis. 259; *Butler v. Threlkeld,* 117 Iowa, 116; 34 Cyc. 981. See note to *Williams v. Hamilton,* 104 Iowa, 423, in which cases are collected.

III.    Counsel for appellant also argue that defendants were incompetent as witnesses to testify to any communications between them and the deceased because so rendered by

3. EVIDENCE: conversations with a decedent; waiver of objection. section 4604 of the Code. The objection was but once made, and that to an inquiry concerning a conversation with the plaintiff. Of course, this objection was not such as to invoke a ruling on the point argued, and, as the competency of the witnesses to speak of what may have passed between them and deceased was in no wise challenged, such objection must be deemed to have been waived. *Burdick v.*

*Raymond,* 107 Iowa, 228; *McDonald v. Young,* 109 Iowa, 704.

IV.   It is not claimed that any precise form of expression or of words adopted by the parties was omitted from the contracts, but that, as written, these did not express the agreements as the parties previously had made them, and that this mistake happened through the error of the scrivener in reducing them to writing.   Though he and the parties as well may have supposed that the condition that the payments should be made only in event the mother ceased to make her home with either son, if through oversight or ignorance of the import of the language employed on the part of Heptonstall who prepared them a part thereof was omitted or the understanding was not evidenced in the instruments as written, the cause is one appropriate for the intervention of a court of equity, and the contracts will be reformed so as to conform to what the parties really intended.   It is not very important whether the mistake be denominated one of fact or of law, though it may well be doubted whether the so-called mistakes of law against which chancery relieves are not, when reduced to the last analysis, mistakes of fact.   If the contract as written fails to express the agreement on which the minds of the parties met, it is not theirs, and the true agreement has not been executed, and in such a case equity will grant relief without regard to the cause of the failure to express the contract as actually made whether it be from fraud, mistake in the use of language, or any other thing which prevented the expression of the intentions of the parties. *Stafford v. Fetters,* 55 Iowa, 484; *Lee v. Percival,* 85 Iowa, 639; *Hausbrandt v. Hofler,* 117 Iowa, 103; *Bottorff v. Lewis,* 121 Iowa, 27; *Bonbright v. Bonbright,* 123 Iowa, 305.   The rule was concisely stated by Mr. Justice Washington in *Hunt v. Rousmaniere's Adm'rs,* 26 U. S. (1 Pet.) 1, 7 L. Ed. 27: "Where an instrument is drawn

4. REFORMATION OF INSTRUMENTS: equitable jurisdiction.

or executed, which professed or is intended to carry into execution an instrument . . . previously entered into, but which by mistake of the draftsman either as to fact or law, does not fulfill that intention, or violates it, equity will correct that mistake so as to produce a conformity to the agreement." In *Beardsley v. Knight,* 10 Vt. 185 (33 Am. Dec. 193), it was said that, "where there is a mistake in reducing an agreement to writing, equity will correct it whether the parties failed to make it in the form intended or misapprehended its legal effects." The rule as thus clearly stated was applied in *Courtright v. Courtright,* 63 Iowa, 356, and *Nowlin v. Pyne,* 47 Iowa, 293. The distinction between mistakes of law which will and will not be corrected was well stated by Marshall, J., in *Wisconsin Marine & Fire Ins. Co. v. Mann,* 100 Wis. 596 (76 N. W. 777): "The mistake of law which is not the subject of relief in equity is mistake as to the legal result of known facts by reason of some misapprehension of the legal meaning of the language used; not mistake in reducing to writing an agreement upon which the minds of the parties previously met in making a preliminary verbal agreement. The latter is a mistake of law in one sense, not a mistake of law as to what the parties wanted to do in drawing the paper, but rather as to the appropriate language to accomplish their intention. If it were the former, they would be remediless in equity under the rule under discussion. But, if the latter, it is not, and has not been, considered within that rule, since the true scope of it was definitely worked out in the development of equity jurisprudence. In the one case there is a mistake in the making of the verbal contract growing out of a misconception as to the legal scope or effect of known facts; in the other there is no mistake whatever as to the contract actually made, but a mistake in the legal import of the language used in reducing that contract to writing." A mistake in a contract itself, springing from ignorance of law, is one

thing, and a mistake in the legal meaning attributable to words used to express a contract is quite another. The rule may be properly stated thus: "Where there is a mutual mistake of fact either in the making of a contract or of law or fact in the reducing of the contract to writing, the person injured thereby may have it reformed in equity in accordance with the truth, in the absence of facts ·or circumstances constituting a waiver of the remedy or an estoppel to the assertion of it." Enough has been said to indicate that we are not in accord with the contention that the mistake is one which equity will not correct. If there was a mistake at all, it was in failing to embody the agreement as made into the written contracts, and, as seen, for such mistakes equity affords a remedy.

V. Nor is there anything in the suggestion that defendants have been dilatory in seeking reformation of the contracts. Previous to the demands shortly before the action was begun, no claim had been made for payment from either defendant. Nothing had happened to indicate that plaintiff construed the contracts otherwise than they had. Promptly upon the beginning of the suits, they asserted their alleged mistake, and in the cross-petition prayed that it be corrected. They were not negligent in seeking relief. *Bottorff v. Lewis*, 121 Iowa, 27; *Manatt v. Starr*, 72 Iowa, 677.

5. SAME: laches.

VI. Does the evidense establish a mistake such as alleged in the cross-petition; that is, did the parties in agreeing that Timohy J. Coleman should pay $200 yearly and William P. Coleman $300 yearly include the condition that such payments should only be made when the plaintiff, their mother, did not make her home with her son William or with William or Timothy. It appears that M. M. Heptonstall, then cashier of a bank at Pioneer, prepared the deeds for Mr. and Mrs. Coleman to sign. He went to their home for that purpose, and, after having drawn the deeds according

6. SAME: evidence of mistake in writing.

to his testimony, "suggested that there should be some consideration, whereby, if anything should happen that Mrs. Coleman did not wish to live with the boys, that she should know what she was to receive.   Q. Mr. Heptonstall, after you made that statement relative to something being prepared to show what Mrs. Coleman should receive if she elected to live at some other place than with the boys, what, if anything, did Mrs. Coleman say?   A. I do not recollect. There was a general response to the suggestion that I made that it would be done.   Mr. Coleman, Sr., assented to the arrangement.   I did nothing further that day than make the deeds.   I believe subsequent to that time I did.   I can not recall whether I again was recalled at the home of Mr. Coleman, Sr.   I believe I was present when the leases or agreements were signed.  .  .  .   Q. Now, Mr. Heptonstall, at the time you prepared these leases, had anything further been said to you or any further conversation with Jeremiah Coleman, Sr., or Elizabeth Coleman, his wife, than the conversation you have described?  .  .  .   A. I told them that, while everything seemed to be pleasant at that time, there might come a time when she would want to live apart from them, and that she should then have a definite amount stipulated, so that there would be no contention over it.   There was then a talk as to the amount that should be stipulated.   I suggested that the boys decide between them what they should pay in this case of her living apart from them, and I think J. Coleman, Jr., and W. Coleman and T. Coleman together discussed as to the amount they should pay to the best of my recollection. That they discussed in the presence of the old gentleman, Mrs. Coleman, and myself.   In that discussion the amounts named were afterwards put into the leases.   I believe that I prepared the lease after that time."   The witness then testified that in preparing the lease he intended to conform to the intention of the parties, and that he intended to provide in the leases a proper amount—make the lease—in

the lease, and proper amount between the brothers, and the stipulated amount with the parents that they should receive in case of any dissatisfaction in living with the children. He was then asked what he had said to the Colemans at that time as to his understanding of what it meant, and answered "I said that, if she lived there, there would be no trouble about it; but, if she did not, there should be a stipulated amount. My understanding was that it was simply a life lease with this additional provision that I said—is that plain?"

The witness then testified in answer to questions that he did not understand in drawing a contract that the amounts were to be paid to Mr. and Mrs. Coleman while living with her sons. From this it is very evident that Heptonstall suggested the contracts subsequent to drawing the deeds with a view of having Mrs. Coleman protected in event she should not find living with the sons agreeable, and that he supposed he had expressed this thought in the contracts. Timothy J. Coleman testified that the arrangement between himself and William and his father and mother had been that the parents should live with William and himself the remainder of their lives, and be taken care of by them; that Heptonstall, after drawing the deeds, said that "in case the old lady should become dissatisfied, and want to go and live outside of the home of Will or me, that some amount should be stated that she should receive in that event. Father and mother both spoke up, and said that they knew there would not be anything of that kind happen or anything like that, and they did not see any occasion for such. Heptonstall still suggested that there should be some exact price fixed in event that anything should happen. It was discussed what would be reasonable or the correct amount to be stated in that case, and it was agreed upon that $500 looked to be as reasonable for that amount. Then he asked each one if they understood with regard to that matter. Heptonstall went through then the

meaning of the contract. He said: 'You all understand now that Mrs. Coleman is to remain here and to live with you, Timothy and Will, for the balance of their lifetime?' He mentioned my father, too. He said, 'Now, in case she was to leave, you understand the amount is to be $500 to be paid when she goes, and that all agree that they all understand the meaning of that contract to be such?' Heptonstall explained the contract verbally to father and mother so that they would thoroughly understand it."

The witness further testified that he suggested doubt as to whether the contract meant $500 yearly only in case his mother left, but that Heptonstall stated reasons for thinking otherwise, and explained that neither of the sons were to pay while his mother was living with him or Will, and that his mother had said, in response to Heptonstall's suggestion that "she never wanted to leave her baby boy, Will, she desired to live with him all her life from that time on." The version of the transaction given by William is substantially the same. He related: That, after his parents had said to Heptonstall that the sons would keep them the remainder of their lifetime, the scrivener said: "I think I had better make out a lease for you, Mr. and Mrs. Coleman, in case you get uneasy. In case they want to go when they get old with some of their daughters, I think I better make a lease out for you to pay about $300 a year and Timothy $200, and that is not to be paid unless she goes away and don't live with you, but, if she does go away, you have got to pay." That his mother suggested that she did not care for such arrangement, to which Heptonstall or his wife responded, "Now, maybe Will will go and get married and go and bring a wife here, and maybe you will want to go and live with one of your daughters;" and that his father and mother finally agreed, and said: "That will be all right, that is to make—that is, of course, they didn't agree that we was to pay this while she was living with us." It was made to appear, also, that Timothy

had remained at home with his parents on the farm five or six years and William four or five years after having attained their majority, and both testified that during that time it had been talked in the family that Timothy was to have the one hundred and twenty acres and Will the one hundred and sixty acres.

The evidence leaves no doubt but that prior to the suggestion of Heptonstall neither the sons nor their parents had any thought of a contract being made in addition to the deeds. Moreover, the plaintiff resided with William from the time of her husband's death until May, 1909, without mentioning their obligation to pay under the contracts. It is true that during this period Timothy had contributed but a trifle to her support, but this may be explained on the theory that William was giving her care of which she had made no complaint to any of the children. It is true that at times he did not have ready money which she wished for necessities, but there is no contention on her part that she was not reasonably supplied with means to travel and visit her children and with suitable clothing. Jeremiah Coleman, Jr., though present when the conversation was had, was unable to recall any portion of that between Heptonstall and his parents, save the following: "My father said that he wanted my mother protected for the future, and I butted in, and then said: 'You need not worry anything about mother that way,' I says, 'if her son Jerry had to take care of her,' I said. And he answered me back, and he says: 'I do not want mother trusting to you, Jerry, or to anyone else.' He says: 'I want you to fix it right there, Mr. Heptonstall.'" And he answered, "that is what I want to know," and he started on. "Father wanted her protected in $300 from Will and $200 from Timothy. I did not hear him say 'yearly.'" All this is entirely consistent with the contention of the defendants. If plaintiff enjoyed a home with her sons and was provided for, she would be protected, and it was only in event that these ar-

rangements were interrupted that she should conclude to live elsewhere that the protection spoken of probably was contemplated. The plaintiff testified that Heptonstall had suggested that the sons pay her money, that this had not been talked over previously, but that she did not hear in any conversation the alleged condition that the amounts were not to be paid while she made her home with her sons. But she admitted that it was her intention to make her home with William, and during all the years she did make her home with him her conduct was entirely consistent with the contention that she was not to be paid the sums stipulated in the contracts unless she concluded to live elsewhere. The circumstance that there had been no thought of the contracts until suggested by Heptonstall after the deeds were prepared confirms the claim that the deceased and his wife had intended that the latter when a widow be cared for by the sons, and that, at the scrivener's suggestion, the contracts were executed to protect her only in event this arrangement should not prove satisfactory. All was done in the presence of deceased, who, as said, was afflicted by a fatal malady, and who in signing the contracts in reliance on the explanation of their meaning by Heptonstall must have labored under the mistake which the other parties thereto are shown to have made.

It is also to be observed that the preponderance in number of witnesses is in favor of the conclusion reached by the district court before whom these testified, and some consideration should be given to its superior advantages in determining the credibility of the several witnesses. We are not inclined to interfere with its finding that the mistake as alleged has been clearly and satisfactorily established, and that the contracts should be treated as though reformed. One-half the costs will be taxed to appellees.— *Affirmed.*