JOHN W. WORMER et al., Appellees, v. L. GILCHRIST et al., Appellants.

No. 39855.

464

May 16, 1930.

Crissman & Linville, for appellants.

L. D. Dennis, for appellees.

De Graff, J.—The facts of this case are not in serious dispute. The record discloses that John W. and J. C. Wormer (plaintiff-appellees) were the owners of certain real property located in the town of Center Point, Linn County, Iowa, and that the Gilchrists (defendant-appellants) were the owners of a quarter section of Linn County, Iowa, land. On August 12, 1924, articles of agreement were signed by Geraldine and L. Gilchrist and the Wormers, to exchange certain described real estate owned by the respective parties. The contract recites that the Gilchrists were "to furnish a merchantable abstract" to the quarter section in question, and that said property was "subject to an incumbrance as follows: A first mortgage of $13,500 bearing interest at 5½% (mtg. due in 1928)." The contract also provides: "Possession to be given [of the Wormer

property] on tender of possession of farm at any time on or before March 1, 1925.'' In the mutual exchange of the properties aforesaid, the contract stipulates that each party thereto shall pay his own agent a commission. The two brokers negotiating the exchange were C. L. and W. R. Watsabaugh, who were named in the contract, C. L. acting for and on behalf of the Gilchrists, and W. R. on behalf of the Wormers.

On the 26th day of August, 1924, F. W. Gilchrist (single person) executed, in consideration of $1.00 and other valuable consideration, a warranty deed to J. W. and J. C. Wormer, conveying the quarter section of land involved in the exchange. At that time the land was cropped, and the Gilchrists' deed was given as a matter of convenience in consummating the exchange of properties.

The only issue in this case involves the question whether the Gilchrists were to pay the interest on the $13,500 mortgage up to the time that they surrendered and gave possession of their farm to the Wormers. The prayer in plaintiff's petition is that the contract between the Wormers and the Gilchrists ''be reformed to meet the agreement of the parties thereto, and also that the deed of conveyance to the Wormers be reformed to conform to the contract and agreement of the parties to the exchange of said properties in respect to the promise and undertaking of the defendants L. Gilchrist and Geraldine Gilchrist to pay the interest on the $13,500 mortgage from the first day of March, 1924, up to the time of the mutual exchange of possession consummated under agreement of exchange, which exchange of possession took place March 1, 1925; and further pray that they have judgment against the defendants [Gilchrists] for the sum of $495, with interest from July 1, 1925, at 6%, on account of interest paid by plaintiffs in paying the defendants' share of interest due on the said mortgage.''

Equitable jurisdiction with reference to the reformation of a contract is well defined. If a written contract fails to express the true agreement of the parties thereto, then equity may be invoked, and if invoked, will grant relief, under proper circumstances, without regard to the cause of the failure to express the contract as actually made, ''whether it be from fraud, mistake in the use of language, or any other thing which prevented the expression of the intentions of the parties.'' *Coleman v. Cole-*

*man,* 153 Iowa 543, 1. c. 552. It is said in *Costello v. Stokely Grain Co.,* 193 Iowa 203:

"To authorize a reformation there must be shown 'such a degree of proof as will produce in an unprejudiced mind the belief and the conviction of the truth of the fact asserted, taking into consideration all the surrounding facts and circumstances.' *Rensink v. Wiggers,* 99 Iowa 39. In cases of this character the so-called parol evidence rule finds no application, and it is competent to show the conversations and the surroundings of the parties to the contract prior to its execution."

A contract may be reformed to correct a clearly established mutual mistake, even though the party praying for the reformation was guilty, in a measure, of negligence. *In re Estate of Patterson,* 199 Iowa 362.

The well settled rule that parol evidence cannot be invoked to vary the terms of a contract has no application to prevent proof of a mistake or reform an instrument to correct the mistake. *Greiner v. Swartz,* 167 Iowa 543. See,  also, *Good Milking Mach. Co. v. Galloway,* 168 Iowa 550; *Bonbright v. Bonbright,* 123 Iowa 305; *Hausbrandt v. Hofler,* 117 Iowa 103; *Lee & Jamieson v. Percival,* 85 Iowa 639; *Stafford v. Fetters,* 55 Iowa 484.

Evidence in the instant case is clear and convincing that the written contract did not express the real and true intent of the parties. C. L. Watsabaugh, the agent for the Gilchrists in negotiating the exchange of the properties in question, testified:

"The deal was pending about two weeks, and was closed about the 12th of August. The Gilchrists were to pay the interest on the mortgage ($13,500) up to the date on which they gave possession of the farm. At the time we were working up the deal, they [Gilchrists] asked me if it would be possible to get the Wormer Brothers to assume the interest and taxes, and I told them it would not be possible to get them to assume the interest until they gave possession of the farm. The Wormer brothers said they would take over the interest from the time they actually got possession of the farm, but they would not pay interest back of the date they actually got possession. After I

told the Gilchrists what the Wormers told me about the interest and taxes, the Gilchrists said they believed they would give possession about December 1st, and get loose from that interest. They made no objection to the payment of the interest at that time. After these conferences, I drew the contract.''

After the Gilchrists signed the contract, their agent, C. L. Watsabaugh, went to the office of his brother, W. R. Watsabaugh, agent for the Wormers, and the contract thereupon was presented to the Wormers.

''Q. What, if anything, did either of them [Wormers] say regarding the interest on the mortgage? A. John Wormer asked me if it ought not to be written in the contract that the Gilchrists agreed to pay the interest to the date of the delivery of the farm. I told them my understanding always had been that an abstract of title showed what was against the farm in actual dollars. They insisted that I write it in, and I told them I would not, without calling the Gilchrists and having them approve adding to the contract after they had signed it. Consequently, we finally got the Wormer brothers to take it on my say-so—that the interest would be paid by the Gilchrists. I told the Wormer Brothers that, notwithstanding that the provision was not specifically set forth in the contract, that the Gilchrists had agreed to pay the interest. It was under these conditions that the contract was signed. Q. Did you [Gilchrist's agent] think, when you drew the contract, that it was broad enough to cover the true agreement between the parties, relating to the interest as you have stated? A. I did. I thought it covered it all, and told the Wormer Brothers that it did. Q. At the time the Wormer brothers signed the contract, and before they signed it, did you explain to them the particular provision that you felt covered the question of the interest? A. I did. Q. Did you tell them that it did cover the question of interest as they wanted it put in the contract, specifically? A. I did.''

Turning to the testimony of W. R. Watsabaugh (Wormers' agent), we find the following:

''I was present with Geraldine and Fred Gilchrist when the contract was gone over, and the question as to interest and taxes was raised at that time, at the Gilchrists' farm. The arrange-

ment was that they [Gilchrists] were to give possession as early in the fall as possible after this contract was made. The Gilchrists would give possession to the Wormers, and they [Gilchrists] would pay the interest on the mortgage up to the time possession was actually given. The final arrangement with reference to the interest on the mortgage was that the Gilchrists were to pay it up until the time possession was given, and after that, the Wormers were to assume the interest. Fred Gilchrist, Geraldine, and my brother talked it over in my presence. My brother said the Wormer brothers wouldn't pay any interest on the farm until they got possession, and I told them the same thing. When my brother told them that, they [Gilchrists] decided that was the best they could do on the trade, and they would accept. They [Gilchrists] agreed to pay the interest up until the time they gave possession, that evening before the contract was signed.''

We have, therefore, not only the testimony of the agent of the Gilchrists, but also that of the agent of the Wormers and of the two Wormers to the same effect, relative to the matter of interest. Is this evidence contradicted in any material sense? We answer in the negative. The defendant F. W. Gilchrist testified that, on the night that the contract was signed, nothing was said about taxes or interest by W. R. Watsabaugh. The testimony of Gilchrist is silent as to prior negotiations and consultations. The greater part of the negotiations were during the two weeks preceding the signing of the contract, and the testimony respecting these consultations is undenied by the defendant F. W. Gilchrist. There is no denial by the defendant L. Gilchrist of the testimony of C. L. and W. R. Watsabaugh that the Gilchrists were to pay the interest on the mortgage indebtedness up to the time the Wormers were given possession of the quarter section. So far as the testimony of Geraldine Gilchrist is concerned, she simply ''didn't have any distinct recollection that the question of taxes and interest on the mortgage was discussed between us and the Watsabaughs before the contract was signed.''

The trial court was not in error in ruling that the evidence was clear, satisfactory, and convincing; that the real agreement and true intent of the parties were that the contract did con-

template that the Gilchrists would pay the interest on the incumbrance up to the time the Wormers received possession of the farm. The fact that the scrivener (C. L. Watsabaugh) erroneously thought that the clause in the contract requiring each of the parties to furnish a merchantable abstract was broad enough to cover the question of interest, is not sufficient, in equity, to prevent the reformation of the contract so as to express the true agreement of the parties. The actual and real agreement of the parties is what equity seeks to discover and enforce, regardless of the cause of the failure so to do. *Coleman v. Coleman,* 153 Iowa 543. This is not a case in which equity is writing a new contract for the parties. True, there was an executed contract, but it was not the contract that the parties intended. There was a parol agreement which the record convincingly shows was made, and which was intended by both parties to be included in the contract. The real estate commission men involved here were acting within the scope of their authority, and the Gilchrist agent had the right to speak and act as he did, and the Gilchrists were bound thereby.

We conclude that the trial court properly found the equities to be with the plaintiffs. The decree entered is, therefore,— *Affirmed.*

MORLING, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.