MASSACHUSETTS BONDING & INS. CO.
v. LUNDY.

No. 13467.

Circuit Court of Appeals, Eighth Circuit.
April 7, 1947.

T. F. Ryan, of Pittsburgh, Pa., and James P. Irish, of Des Moines, Iowa (Frank J. Comfort, Richard F. Mitchell and Joseph H. Bialas, all of Des Moines, Iowa, on the brief), for appellant.

Denis M. Kelleher, of Fort Dodge, Iowa (John D. Kelleher, of Fort Dodge, Iowa, and Lyman R. Lundy, of Eldora, Iowa, on the brief), for appellee.

Before SANBORN, WOODROUGH, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

Mr. Lundy was the Manager of the Des Moines Branch office of the Massachusetts Bonding and Insurance Company from July 1944 to October 1945, and the company paid him a salary at the rate of five thousand dollars per annum, orally agreed upon at the time of his employment, but it was also mutually orally agreed at that time that he should be allowed a share of ten percent in the underwriting profits of the company on business produced by him as Manager and reported to the company through its Des Moines Branch and that part of the employment agreement was reduced to writing. The written contract contemplated a relationship continuing from year to year between the company and Mr. Lundy as Manager of its Des Moines office and it provided for settlement of the amounts of the underwriting profits of the company upon computation thereof according to a prescribed formula and payments by the company of ten percent of the amounts of such profits after the expiration of each one-year period. But it was provided that in the event of termination of the employment arrangement no computation of the

underwriting profit should be made until three months after all risks written by the Des Moines Branch while under the management of Mr. Lundy shall have expired or have been cancelled. The arrangement was terminated as of December 11, 1945, after having been in effect about 17 months, but dispute as to the amount of the profits prevented any agreement upon a settlement.

Mr. Lundy brought this action against the company on November 12, 1945, to obtain a declaratory judgment defining and establishing his right to compensation under the written profit-sharing contract according to its terms, an accounting as to the amount thereof, and ultimately a final judgment for such amount. The company pleaded (i. a.) that the written instrument did not set out correctly the contract entered into between the parties but that in reducing the contract to writing the scrivener made a mistake in setting out the formula for computing the underwriting profits, in that the formula which was set out in the instrument required crediting Mr. Lundy for premiums reported by him but erroneously failed to provide for debiting him with the expense of operation of the branch and the unallocated losses as was intended, and it prayed for reformation of the contract to conform it to the true agreement and intent of the parties.

On the trial to the court judgment was entered establishing the contract as written as the binding contract of the parties, determining that the sum of $4,256.36 became due the plaintiff thereon for the first year period and awarding him judgment therefor and retaining jurisdiction to require defendant to account to plaintiff as to the remaining period of the employment on the same basis of computation within three months after all risks written by the branch while under the management of Mr. Lundy shall have expired or been cancelled. The company appeals.

It appears that Mr. Lundy, although now engaged in the practice of law as an attorney, had experience in the insurance business when he applied for employment with the defendant, having been secretary and manager of the underwriting department of one company, vice president of automobile underwriters, attorney in fact of another, and president of another, and the oral understanding upon the terms of his employment as Manager of the Des Moines Branch was reached in conversations between himself and two vice presidents of the defendant. Mr. Lundy and a Mr. Flynn (the first vice president of defendant, who had been with the company some forty years), both testified that the understanding arrived at in the conversations between them was that Mr. Lundy was to receive the salary of $5,000, and also that he was to be allowed ten percent of the underwriting profits of the company on business produced by the Manager at the Des Moines Branch, and as the written contract reflects exactly the same understanding of the parties as to profit-sharing, it is clear that there was mutual agreement on one side to allow and on the other to receive the stated percent of profit of the company on the business so produced. When the parties had thus orally agreed upon the terms of Mr. Lundy's employment it was arranged that he was to go from Boston, where the final conversation was had, to Des Moines, take charge of the branch and proceed forthwith in the position of Manager, and he did so.

The witnesses also testified that it was mutually understood between them that a written contract should be drawn to evidence the profit-sharing agreement that had been reached but the preparation of such agreements was the duty of an employee in the agency department of the company and neither the vice president nor Mr. Lundy delayed their proceedings until that should be done. The vice president informed Mr. Lundy that "our standard profit sharing agreement" would be given and instructed the employee to prepare the same and Mr. Lundy went to Des Moines understanding that the instrument would be so prepared and would follow him there through the mails and he received it a few days later. It was signed by the first vice president and attested by an assistant secretary, and after examining it and consulting an attorney about it, Mr. Lundy signed and returned it to the home office of the company. After reciting that the company had appointed Lundy as Manager of its Des Moines Branch effective July 1, 1944, and that "it

was mutually desired that the Manager be allowed to share in the underwriting profits of the company on business produced by the Manager and reported to the company through its Des Moines Branch", the instrument proceeds: "it is mutually agreed; First: That for the purpose of this agreement the underwriting profits to the company arising from the business produced by the manager at the Des Moines Branch shall be computed and determined as follows:" and then under "Credits" there are set out four numbered designations of items and under "Debits" eight numbered designations of items, and it is provided that "any excess of credits over the debits accruing by the above method of computation shall be considered as the underwriting profit of the year", and "in case the debits shall exceed the credits on the basis of the foregoing computations, the deficit shall be treated as a debit to be carried forward and included in the computations for succeeding years until liquidated."

In paragraph "Third" the company was required to render a profit-sharing statement to Mr. Lundy for the first annual period on or before September 30, 1945, and when the time came to make that statement it was discovered at the home office that a mistake had been made in the formula for the computation of profits on which the percentage was agreed to be paid Mr. Lundy, in that no debit had been designated to cover the expense of operation of the Des Moines Branch office or the allocable losses. Such expense and losses shown at the trial were figured in two items of $28,-172.47 and $9,162.90, respectively, aggregating $37,335.37, and as the total of premiums remitted during the period on business produced by the Branch during the year of Mr. Lundy's employment amounted to only $68,134.61, the importance of the omission of the essential factors of expenses and losses from the computation is clearly apparent. The contract related solely to division of "underwriting profits" of the company, which in common understanding and by dictionary definition could only mean the excess of the company's income over its expense and loss from the underwriting business. There is no intimation that the company or its branch had any busi-

ness except the underwriting of risks for premiums. The company was liable for the losses and paid the expenses of operation of the Des Moines Branch and obviously it could have no "underwriting profit" in respect to the branch operation until such loss and expense were taken into account in computing profit or loss.

The uncontradicted evidence is that the company had forms in its file in the shape of contracts which it had used in contracting on profit-sharing basis with its so-called general agent and also with branch office managers; the essential difference being that the general agent paid the operating expense of his agency himself and the amount of his operating expense was therefore irrelevant to a computation of profit to the company from that agency's business, whereas the company owned and paid the operating expenses of its branch offices and the amount of such expenses at a branch was the most important factor in computing the profit or loss to the company from the business of the branch. In Mr. Lundy's case the employee charged with preparing the contract for him took a general agent's form (which included no agency operating expense) and made notes as to dates and names and turned it over to a typist who filled in the form. He testified that he had made a mistake; that he did not have in mind the distinction between a general agent and the manager of a branch in respect to the matter of operating expense and that if he had had the distinction in mind he would have included a debit item to cover all the operating expenses of the branch office, and that his failure to include it was a mistake on his part. On getting the document back from the typist after it had been checked for typographical errors, he made no examination of it but sent it to the first vice president who in turn made no examination of the details of it except to see that it was Mr. Lundy's name and to recognize the fact that it was a profit-sharing agreement. He relied upon the employee to whom he had delegated the preparation and after signing it caused it to be transmitted to Mr. Lundy. That the document was not an original composition at the time but was a form filled in was demonstrated by the produc-

tion from the company file of a contract dated 1929 in which the wording through two large pages of typewritten matter is identically the same (with slight immaterial exception) as the corresponding wording of the Lundy profit-sharing agreement.

The district court absolved Mr. Lundy of any fraud or trickery or bad faith in accepting the document and signing and returning it, though Mr. Lundy admits he made careful study of it and consulted with an attorney about it, but the fact remains that when he read the document it was obvious to him as a man of intelligence, training and experience, that the formula for computation contained in it lacked the essential factors of the operating expenses and losses to set against the credit to him for "premiums remitted, less return premiums, during the period", and therefore that the computations it directed could not produce the true underwriting profit to the company on which the company had agreed to pay and he had agreed to accept the stipulated percentage. Giving credit for premiums without charging for the costs of the business of the Branch which produced them necessarily must, and study of the figures convinces that it does, result in an unconscionable gain for Mr. Lundy and detriment to the company never contemplated by either at the time of the employment.

There was a debit item in the formula "9. Home Office Overhead Allowance at 10% Net Premiums Written" included because the home office was expected to and did incur an overhead expense in respect to its supervision of the Des Moines Branch, and on the trial Mr. Lundy claimed the percentage allowed in the contract formula for such home office overhead was excessive, and he sought to relate the item to the operating expense of the Branch. But it is clear that the item designating the home office overhead afforded no basis for belief or understanding that such home office overhead related to or meant the operating expenses of the Branch. In order to express the true intent of the parties and to make the division of profits they agreed upon, it was necessary that an item for the home office overhead in respect to the Branch be taken as a factor to compute the amount of profit to be divided and this item

9 was manifestly adapted to that end and no other, and was a separate and distinct and proper element in the computation. None of the other items of credit or debit in the formula was adapted or intended to supply the element of allocable loss and operating expense.

The only inference that may fairly be drawn from the evidence, and what it clearly and unequivocally shows, is that the written instrument does not correctly set forth the contract the parties agreed upon but through the mistake of the person to whom as they both understood the task of writing it up was relegated, a wrong formula for computation was inserted which could not and does not produce that division of profits upon which the minds of the parties met.

 It must therefore be concluded that the trial court was in error in declaring the document as written to be the contract of the parties and attempting to enforce it as written. The evidence does not indicate that it is impossible, or even difficult for accountants to state a formula for computation of the amount of the profits which the parties mutually intended and agreed should be computed and divided. The company has some eighteen branch offices like the Des Moines Branch, and there is nothing in the record to justify an inference that it can not show its profit and loss in respect to them with substantial accuracy. And it is clearly within the power of equity to require the contract to be reformed as prayed to strike out the inapplicable formula for the computation inserted by the scrivener by mistake, and to include a proper one conforming the contract to the mutual intent of the parties. The parties have assumed and it appears that the Iowa law is controlling here, and the decisions of the state plainly affirm such power in the court where, as in this case, both the true intent of the parties and the mistake in its writing is clearly and unequivocally proven and justice requires that reformation be made. Merle O. Milligan Co. v. Lott, 220 Iowa 1043, 263 N.W. 262; Coleman v. Coleman, 153 Iowa 543, 133 N.W. 755.

 Upon the reformation of the contract conforming it to the intent of the parties, the trial court will be required to con-

sider the question of relief, if any, to be accorded. Although the parties contemplated and agreed upon settling the profit division after the expiration of each yearly period, they also contemplated and the contract provides, that on the termination of the relationship the settlement should be deferred until after all risks written by the Branch while under the management of Mr. Lundy shall have expired or been cancelled, and it was shown that the risks had not reached that condition at the time of the trial. It was not indicated when they probably would do so. Clauses of the contract which we have quoted provide that if the computation for a year shows a deficit to Mr. Lundy (that is, no profit to the company but a loss) the deficit should be carried forward into the next year's accounting as a debit against Mr. Lundy. But the contract does not mean that Mr. Lundy obligated himself to pay a loss to the company if such should result from his employment, either at annual settlement periods or on termination of his employment. Accordingly the trial court was not in error in its determination that Mr. Lundy was entitled to have judgment for ten percent of any sum which a proper accounting of the company's profits of the business produced by him through the Des Moines Branch in the first year of his employment may show.

The court found that sum to be $4,256.36,[1] but it was reached without taking account of the operating expense of the Branch or the losses unallocated but allocable to it, and may not be sustained.

We have carefully considered the several methods of computation of profit and loss and the results thereof shown in the evidence, but do not decide the disputes in respect to them in view of the required reformation of the contract. Having affirmed the trial court's determination to adjudicate upon the amount, if any, due to Mr. Lundy upon a proper accounting of the underwriting profits of the company on business produced by the Manager and reported to the company through its Des Moines Branch for the first year period, we reverse that part of the decision which establishes the written instrument as the contract of the parties and direct that the writing be reformed in accordance herewith and that the computation of the first year's profit and loss be made accordingly. Also that judgment be awarded for the amount, if any, so found due Mr. Lundy for the first year's services. The judgment for $4,256.-36 is reversed.

As to Mr. Lundy's claims respecting his employment during the period after the first year, we find no error in the trial court's determination that no accounting as to profits should be made until after the expiration or cancellation of the risks and its determination to reserve jurisdiction to require the company to account at that time. But we hold that such accounting must be made upon the basis of the contract as reformed to reflect the true intent of the parties in accord herewith.

Though we have fully considered all of the contentions presented, we do not deem it necessary to discuss issues beyond those we have decided. The judgment is reversed with direction to reform the contract so as to include in the formula for computing profit and loss for the first year the elements of expenses of operation of the Branch and allocable losses and also to require the inclusion of those elements in any computation that may later be made of profit and loss in the remaining period of employment.

Reversed and remanded.

[1] The sum is practically ten percent of the aggregate allocable loss and operating expense of the company in respect to the Branch for the first year, the difference being only $84.58.