JAMES R. BLAKE, appellant, v. MR. and MRS. LYLE C. HUFFMAN et al., appellees.

No. 49174.

(Reported in 83 N.W.2d 460)

June 4, 1957.

Clark D. Mantz, of Audubon, for appellant.

H. Wayne Black (deceased), of Audubon, and Leland C. White, of Harlan, for appellees.

SMITH, J.—Plaintiff, as "first party", and defendants Lyle C. Huffman and wife, on February 17, 1954, executed a written contract "to terminate the agreements (under) which (they) have operated the premises (described) and under which second parties occupy said premises owned by first party and Mary Parsons." We shall refer to this agreement hereinafter as "Exhibit One."

The farming relations it sought to sever began by oral agreement in December 1952 and involved some 320 or 400 acres of land situated partly in Audubon and partly in Guthrie County, and belonged to plaintiff, except 80 acres which he rented from his sister who is not a party here.

The trial court found the evidence showed "without material dispute" that plaintiff was "to furnish the land, livestock, feed and to do all the buying and selling of livestock and crops and the defendant to furnish the farm machinery and the labor to operate said farm and the profits from said venture were to be divided equally."

A written contract was executed on January 18, 1954, before the parties decided not to continue the tenancy. It was expressly for the year 1954, but was also expressly terminated by Exhibit One "on the completion of this settlement as of March 1, 1954." Its importance here seems negligible.

The defendants, other than Mr. and Mrs. Huffman, were not parties to the farming arrangements and have filed no appearance or argument on appeal. Defendant Klinkefus was operator of the sales barn at Guthrie Center where the jointly owned livestock was sold the afternoon of February 18, 1954, and he was clerk, and defendant Garoutte was auctioneer, at the public farm sale of the other property February 24. The defendant bank had helped finance the Huffmans and also acted in the capacity of a depositary or stakeholder of funds pending final determination of rights and distribution pursuant thereto.

Any reference hereinafter to "defendant" or "defendants", without further identification, will mean Lyle or Mr. and Mrs. Lyle Huffman, as the case may be.

Plaintiff in written brief describes the present proceeding as brought "to reform a written farm partnership or joint adventure accounting agreement, because of mutual mistake and scrivener's error or in the alternative for correcting error in the accounting distribution." The description may be slightly inaccurate. It is really a suit to reform the contract, Exhibit One.

Defendants explain that although other counts are included, "before any evidence was taken, and at the request of plaintiff, and with concurrence of the defendants, it was ruled that the evidence would be limited to a question of reformation of this agreement", Exhibit One.

That contract was based largely on data gleaned from plaintiff's own records. Defendant Lyle Huffman says "I rented this farm through my uncle Ed Fairchild who I knew was leaving the farm." He financed himself by a mortgage of $1450 to defendant Harlan National Bank: "I mortgaged machinery and half the crop that was raised on the place. * * * I borrowed more money from the bank during that year and at the end of the year I owed $4400."

He also testifies plaintiff handled (during their operation) all the money from the sale of the livestock and crops: "I saw some of the sales slips from the sale of livestock and crops, this was not very often. * * * occasions when he wanted to show them to me. * * * I was never consulted by Mr. Blake in regard to the joint sales or expenses. I saw his ledger marked Exhibit 19 a few times * * * over in John Donahey's office and a few times before that." (Mr. Donahey was plaintiff's attorney.)

Exhibit One was negotiated and drawn in Mr. Donahey's office, after the tenancy had existed some fourteen months. The parties met there at least three times, February 13, 15 and 17, 1954. On the 15th and 17th defendants were represented by Attorney William Lewis, as was plaintiff of course by Attorney Donahey, at all sessions. Defendant's father, Charles Huffman, was also present at least on two occasions.

We need not set out the entire contract but shall try to discuss only the matters bearing on the instant controversy. Effort was apparently made in negotiating Exhibit One to agree as to the various rights and interests of both plaintiff and defendants and provisions made for sale where necessary in order to effect division of the property.

Paragraph 3 of Exhibit One provides: "It is agreed that the work sheet attached hereto marked Exhibit A, and by reference made a part hereof, summarizes the operations of first and second parties to date and that as a result of said operation a balance of $7666.95 is owed by second parties to first party." Another attached work sheet (Exhibit B) is agreed to constitute "the closing inventory of said parties as of this date", but gives little information as to either amount or value.

Paragraph 9 of Exhibit One provides: "That out of the proceeds of the sale of all their jointly owned property there shall first be paid the expenses of sale, and then the sum of $7666.95 owed to James R. Blake as set forth in paragraph 3 above shall be set off to James R. Blake, and the remaining balance shall be divided equally between the first and second parties, the proceeds of sale to be handled by first party James R. Blake and accounted for by him with second parties having the right to object to any expenses, and to examine accounts at any time. Division of proceeds to be completed immediately by the said James R. Blake on completion of sale of jointly owned property, and delivery of possession of said premises to James R. Blake."

It is hard to reconcile the contradiction between paragraph 3 which says the work sheet summary shows "a balance of $7666.95 is owed by *second parties* to first party"; and paragraph 9, which provides for its payment to first party out of proceeds "of sale of *jointly owned property*" after payment of sale expenses and before equal division between the parties. (Emphasis supplied.)

It cannot be fairly ascribed to the usual scapegoat—the usually convenient scrivener. Plaintiff's own attorney who dictated the entire document does not seriously disclaim its authorship. Various witnesses testify as to the care, taken before it was signed, to eliminate any possibility of error.

Attorney Donahey testifies he discovered the "mistake" in the wording of paragraph 9 the evening of February 17, after the contract was signed and the parties who had been at the final meeting had all separated and gone. He says:

"This was signed about five to six o'clock in the evening, of February 17, 1954. * * * I rode out with Mr. Blake to the Huffman house and Mrs. Huffman signed it and when I returned to my office to work on some income returns that night I got this out to see if it was correct. * * *

"I could see that paragraph nine * * * might lend itself to an interpretation that wasn't intended by myself when I dictated it. * * * that Lyle Huffman's debt of seventy-six hundred sixty-six dollars and ninety-five cents to James R. Blake might be taken out of the joint proceeds rather than out of Lyle Huffman's portion of the joint proceeds. * * * that was, I'll say, eight or nine o'clock on this same night."

Of course this testimony reflects only Mr. Donahey's interpretation of the meaning of plaintiff's accounts from which Exhibit A of the contract was prepared; and is only a "conclusion of the witness" as to the intention of the parties to the contract.

Attorney Lewis testifies: "Mr. Blake had his ledger to show sales and receipts. I asked for sales slips and receipts and Mr. Blake said that this settlement would have to be made on his books, or there would be no settlement, the books he referred to was his ledger. Mr. Donahey and I examined the ledger and it was difficult to work from because of erasures and cross-outs."

Plaintiff testifies: "It was my understanding when this agreement (Exhibit One) was made that $7666.95 would be paid out of Lyle's share and I wasn't to pay any of it." But Lyle testifies: "There was a discussion in regard to paragraph nine of said agreement * * * and I told him I didn't owe that much. At this time, this Blake figure $7666.95 was not filled in. * * * I asked Mr. Lewis if I wouldn't have around half the crop left for my share and Mr. Lewis said I would have, and I said that that should be around right. In regard to section (paragraph) nine * * * I said there was supposed to be paid $7666.95 out of the jointly owned property to James R. Blake, and then the rest divided equally." Attorney Lewis' testimony corroborates this.

The figure was filled in by Attorney Donahey by pen and ink in both paragraphs 3 and 9 of Exhibit One.

Lyle also testifies that after the agreement was ready "each one of us got a copy and we read it over and Mr. Lewis asked Jim if that's the way he wanted it and he said it was, and Mr. Lewis read paragraph nine over to Mr. Blake before we all signed it."

Mr. Charles Huffman also testifies to this fact: "You read over the contract to Mr. Blake and he said that is the way he wanted to settle it. Then you read paragraph 9 over the second time and asked him if that is the way he wanted to settle and he stated yes." Attorney Lewis also testifies: "After Mr. Huffman stated he would sign, I read aloud the entire agreement and each person had a copy. After I read over the entire agreement, I read over paragraph Nine to Mr. Blake and asked if he understood it and would comply with its provisions and he said he would and then Lyle Huffman and James Blake proceeded to sign all six copies."

On the next day, February 18, the parties with Attorneys Donahey and Lewis signed another agreement, Exhibit 2 in the record. This Exhibit 2 was drawn in Attorney Lewis' office in Harlan but it was due to Attorney Donahey's belated "discovery." Donahey testifies it was pursuant to this Exhibit 2 the livestock and other personal property were sold: "We (the two attorneys) worked this out in the morning and then I came back to Guthrie Center, secured the signatures of Mr. Blake and Mr. and Mrs. Huffman that afternoon the cattle and livestock sold at the Guthrie Center Sale Barn. The purpose was to permit the sale to go ahead, rather than to hold it up, in connection with the disposition of this matter finally."

We think that an accurate statement of the purpose of the February 18th agreement and shall not spend more time on it. Exhibit One, paragraph 9, seems to contemplate that plaintiff would attend to the division and distribution of the assets. It was not followed in that respect but that was a mere procedural deviation not involving the merits of the appeal.

The trial court pointed out that while plaintiff testifies he had made advances "of more than seven thousand dollars", he did not testify he made them to defendant individually. The

court found he "has failed to establish his right to reformation on the basis of mutual mistake or error in computation, by clear, satisfactory and convincing evidence * * * and has failed to establish that the minds of the parties did not meet" upon the agreement to distribute as directed by paragraph 9 of Exhibit One.

Paragraph 9 is a clear direction as to the manner of distribution to be followed in returning to plaintiff the advances he claimed he had made. Paragraph 3 which fixed the amount to be distributed to plaintiff describes it as "owed by second parties" but it contains no evidence of such fact. The items constituting it raise no presumption, nor constitute any evidence, that it is an individual debt of defendants. The amount is the difference in footings of two columns, one is headed "Credit to Lyle" and adds to $10,035.51; the other, headed "Debit to Lyle" amounts to $2368.56. The difference is of course $7666.95.

But the largest item in the first column is shown to be one half the "1-52" inventory $11,620, after first deducting chickens $450, making $5585. The next in size, $2377.31, is called "1953 Credit to Huffman." The third, $1372.17, is half the "1954 partnership deficit." The fourth in size, $672.03, is described only as "1954 Credit to Huffman." There is one other item, "Farmers Produce, Audubon bill $29."

The largest item in the smaller column is $2219 described only as one half the 1953 "net cash receipts." The remaining four items of this column are respectively "Langgaard Feed" (½ of $43) $21.50; "Langgaard Sorghum" (½ of $18) $9; "Egg Credits" $9.58; and "Gas Tax refunds" $109.48. There is nothing to identify the result as defendants' individual debt.

The trial court correctly held the agreement constituted "a binding compromise settlement of the joint affairs of the parties" and found it unnecessary to determine any question of priority of liens between defendant Bank and plaintiff; also that the case should be dismissed as to defendants Garoutte and Klinkefus, as they held none of the property in their possession. We agree with the decision.

I. There can be little controversy over the legal propositions involved, once we get down to an understanding of the real nature of the contract sought to be reformed—*not* an agree-

ment based on what was originally intended when the tenancy began, nor even a determination of what was actually owed, but a *settlement* of the disagreements in which the parties found themselves and the manner of its termination and fair settlement.

There should be no difference of opinion over plaintiff's assumption that the parties to the original tenancy agreement had been in effect joint adventurers or partners of a sort, occupying fiduciary relationship toward each other. Plaintiff cites Johanik v. Des Moines Drug Co., 240 Iowa 310, 36 N.W.2d 370; Joseph v. Mangos, 192 Iowa 729, 185 N.W. 464; Goss v. Lanin, 170 Iowa 57, 152 N.W. 43; and other authorities.

The rule in such cases is so announced and well discussed in 48 C. J. S., Joint Adventures, section 5b. Our own court has said the fiduciary relationship exists not only during the life of the partnership but extends to its dissolution as well. Joseph v. Mangos, supra, 192 Iowa, at page 732.

We need not however discuss, or determine its effect here where each side was represented by attorney and all had frankly met to iron out conflicting claims and without any issue or charge of bad faith. The rule of fiduciary relationship is of course one that works both ways. It is not a one-way road.

II. There is really only a factual question presented. Plaintiff's argument assumes the mistake was in paragraph 9 and not in paragraph 3. He argues: "A mistake to justify the reformation of a contract must have been made in drawing the instrument, and not in making the contract out of which it grew", citing Merle O. Milligan Co. v. Lott, 220 Iowa 1043, 1046, 263 N.W. 262, 263. That in effect merely means that the reformation corrects mistakes of language that fail to speak the *real* agreement.

But it does not establish that the error here was in paragraph 9 rather than in paragraph 3. The real purpose of the meeting was, after all, to determine what they would *do*—how they would settle. We have already expressed our concurrence with the trial court's conclusion that plaintiff has failed to carry his burden of proof at this point.

III. That burden, as stated by the trial court, was "to establish his right to reformation * * * by clear, satisfactory and

convincing evidence." See 76 C. J. S., Reformation of Instruments, section 84a, page 454 et seq.; 45 Am. Jur., Reformation of Instruments, section 116, page 651.

That rule has been variously stated to express the same meaning. We have said: "There must be shown such a degree of proof as will produce in an unprejudiced mind the belief and the conviction of the truth of the fact asserted, taking into consideration all the surrounding facts and circumstances." Rensink v. Wiggers, 99 Iowa 39, 41, 68 N.W. 569; West v. West, 90 Iowa 41, 46, 47, 57 N.W. 639; Wormer v. Gilchrist, 210 Iowa 463, 466, 230 N.W. 856.

The opinion in West v. West, supra, page 44, cites 2 Pomeroy Eq. Jur., section 859: " 'Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of the evidence, but only upon a certainty of the error.' "

IV. Plaintiff quotes the "well-established rule" announced in Betz v. Swanson, 200 Iowa 824, 827, 205 N.W. 507, 509, "that a unilateral mistake, *accompanied* by fraud or inequitable conduct [emphasis supplied], will also afford ground for the reformation of a contract", and argues as if defendant is being permitted "to pay his private debt by the use of partnership funds."

But there is here no charge or evidence of fraud or misrepresentation. And the argument assumes, without adequate proof, that the mistake in Exhibit One is in paragraph 9 and not in paragraph 3. They disregard also that in case of payment and acceptance of something in full settlement of a controversy, without fraud or unfair conduct on either side, the compromise cannot be avoided for mistake of fact although subsequent events may show that either party made a bad bargain. 11 Am. Jur., Compromise and Settlement, section 32, pages 279, 280.

We are abidingly convinced the trial court correctly ruled the plaintiff here has failed to carry the heavy burden of proof required of him. The case is affirmed.—Affirmed.

All JUSTICES concur.